GRIEVANCE ADMINISTRATOR v LOPATIN

Docket No. 113250. Argued March 7, 2000 (Calendar No. 9). Decided June 27, 2000.

The Grievance Administrator filed a formal complaint with the Attorney Discipline Board in September 1992, charging attorney Albert L. Lopatin with various misconduct, including giving gifts to and providing services for Court of Appeals Judge Richard M. Maher, failure to disclose the gifts and services, and contacting Judge Maher regarding pending cases in which respondent did not represent a party. Mr. Lopatin was also charged with improperly engaging in an ex parte communication with Court of Appeals Judge S. Jerome Bronson. In 1995, a hearing panel determined that the respondent violated DR 7-110(A) by giving or lending items or services of value to Judge Maher, violated DR 1-102(A)(5) and MCR 9.104(1) by failing to disclose to opposing counsel in a case pending in the Court of Appeals his law firm's representation of Judge Maher and Judge Maher's daughter in an unrelated personal injury suit, and violated DR 1-102(A)(1), (5), and (6), DR 7-110(B), and MCR 9.104(1)-(4) by causing a copy of a memorandum prepared by an associate for a case in which the respondent appeared before Judge Bronson to be sent to the judge without notice to opposing counsel and the other judges on the panel. Considering the nature of the misconduct and some of the aggravating and mitigating factors identified in the American Bar Association Standards for Imposing Lawyer Sanctions, the hearing panel reprimanded respondent for the misconduct. The board agreed that a reprimand was the appropriate discipline for the misconduct in February 1996. The Supreme Court, in lieu of granting leave to appeal, remanded the case to the hearing panel for additional findings and to consider whether any new or changed findings should affect the level of discipline. On remand, after making additional findings, the panel increased the discipline to a forty-five-day suspension. The Supreme Court, again in lieu of granting leave, remanded the case to the board to consider arguments regarding the appropriateness of the increased discipline. 456 Mich 1206 (1997). On remand, the board affirmed the hearing panel's additional findings, but deter-

mined that the Supreme Court's "dismissal" of the Grievance Administrator's application for leave to appeal precluded it from suspending respondent for more than forty-five days. It further concluded that a reprimand was the appropriate sanction for respondent's misconduct. The Grievance Administrator appeals.

In an opinion by Justice CORRIGAN, joined by Chief Justice WEAVER, and Justices TAYLOR, YOUNG, and MARKMAN, the Supreme Court *held*:

The Attorney Discipline Board erred as a matter of law in concluding that the Supreme Court order denying the Grievance Administrator's application for leave to appeal barred the board from suspending the respondent for longer than forty-five days. In light of that error, and because the board did not have the benefit of Supreme Court guidance regarding use of the American Bar Association Standards for Imposing Lawyer Sanctions, remand to the board is required for reconsideration of its order of discipline.

1. The Attorney Discipline Board and hearing panels are to follow the ABA Standards for Imposing Lawyer Sanctions when determining an appropriate sanction for lawyer misconduct. Although, historically, the Supreme Court has utilized an ad hoc approach to determine the appropriate sanction after a finding of professional misconduct, written standards are needed to guide the board and hearing panels. A written set of principles will provide guidance during the process of fixing discipline for lawyer misconduct. Therefore, the ABA standards are adopted on an interim basis. Their use will further the purposes of attorney discipline, help to identify the appropriate factors for consideration in imposing discipline and establish a framework for selecting a sanction in a particular case, and promote consistency in discipline. Application of the standards also will produce reasoned decisions that will facilitate review. The ADB is to explore the development of permanent Michigan standards for imposing lawyer sanctions, and report its proposed standards to the Supreme Court within two years of June 27, 2000.

2. The Supreme Court's order denying the Grievance Administrator's application for leave to appeal as cross-appellant did not preclude the board from increasing the level of discipline beyond the forty-five-day suspension imposed by the hearing panel. As a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals. Law of the case, however, applies only to issues actually decided either implicitly or explicitly in the prior appeal. In denying the Grievance Administrator's application for leave to appeal in this case, the Supreme Court expressed no opinion on the merits. The board was free on remand to consider and decide any matters left open by the Supreme Court mandate. Thus, the board was free to affirm, amend, reverse, or nullify the order of the

hearing panel in whole or in part or order other discipline. On remand, the ADB may consider all sanction options, including disbarment.

Reversed and remanded.

Justice CAVANAGH, joined by Justice KELLY, concurring in part and dissenting in part, stated that under *Johnson v White*, 430 Mich 37 (1988), the ADB was correct that it was barred by the law of the case doctrine from considering whether the respondent's sanction could be increased beyond a forty-five-day suspension. When the Supreme Court denied leave on this issue, the ADB's decision became the law of the case. If it is now reconsidered, the prior denial would be a nullity.

Where a case is taken on appeal to a higher appellate court, the law of the case announced in the higher appellate court supersedes that set forth in the intermediate appellate court. Rulings of the intermediate appellate court, however, remain the law of the case insofar as they are not affected by the opinion of the higher court reviewing the lower court's determination.

*Robert E. Edick*, Acting Grievance Administrator, and *Richard L. Cunningham*, Associate Counsel, for petitioner-appellant.

*Lee R. Franklin* for respondent-appellee.

CORRIGAN, J. In this disciplinary matter, the Grievance Administrator, on behalf of the Attorney Grievance Commission (AGC), appeals an Attorney Discipline Board (ADB) order reducing the discipline imposed on respondent by a hearing panel from a forty-five-day suspension to a reprimand. We hold that the ADB erred as a matter of law in concluding that our prior order denying the Grievance Administrator's application for leave to appeal barred it from suspending respondent for longer than forty-five days. In light of that error, and because the ADB did not have the benefit of our guidance regarding use of the American Bar Association (ABA) Standards for Impos-

ing Lawyer Sanctions, we remand this case to the ADB
for reconsideration of its order of discipline.

### I. THE ABA STANDARDS

Today, we direct the ADB and hearing panels to fol-
low the ABA Standards for Imposing Lawyer Sanctions
when determining the appropriate sanction for lawyer
misconduct. We have historically utilized an ad hoc
approach to determine the appropriate sanction after
a finding of professional misconduct. A comprehen-
sive set of written standards for imposing sanctions
has never existed in this state. Only our occasional
opinion has provided guidance to the public, the dis-
ciplinary body, and the legal profession on this sub-
ject. We conclude that written standards are needed
to guide the ADB and hearing panels.

In the past twenty years, the number of Michigan
attorneys has nearly doubled. With this increase, we
have experienced a significant increase in complaints
regarding attorney conduct. Although only a small
fraction of our bar is disciplined each year, we con-
clude that a written set of principles will provide
guidance during the process of fixing discipline for
lawyer misconduct. We therefore adopt the ABA stan-
dards on an interim basis.[1] Their use will further the
purposes of attorney discipline, help to identify the
appropriate factors for consideration in imposing dis-
cipline and establish a framework for selecting a
sanction in a particular case, and promote consis-
tency in discipline. Application of the standards will

---

[1] We direct the ADB to explore the development of permanent Michigan
standards for imposing lawyer sanctions. The ADB shall report its pro-
posed Michigan standards to this Court within two years of the date of
this opinion.

produce reasoned decisions that will also facilitate our review.

A

The ABA standards establish an analytical framework to guide the disciplinary body in determining the appropriate sanction in a case.

> [T]he standards are not designed to propose a specific sanction for each of the myriad of fact patterns in cases of lawyer misconduct. Rather, the standards provide a theoretical framework to guide the courts in imposing sanctions. The ultimate sanction imposed will depend on the presence of any aggravating or mitigating factors in that particular situation. The standards thus are not analogous to criminal determinate sentences, but are guidelines which give courts the flexibility to select the appropriate sanction in each particular case of lawyer misconduct. [ABA Standards, p 6.]

Under the framework, the disciplinary body initially answers three questions:

> (1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)
> (2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?)
> (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?) [ABA Standards, p 5. See also ABA Standard 3.0.]

Through this inquiry, the disciplinary body identifies the type of misconduct involved in a particular case.

The disciplinary body then undertakes the second step of the analysis. It determines the recommended sanction for the type of misconduct by consulting the relevant ABA standards. ABA Standards 4.0 through 8.0 contain the recommended sanctions for a variety of misconduct. Finally, after determining the recommended sanction, the disciplinary body moves to the third step of the analysis and considers the relevant aggravating and mitigating factors. On review of these factors, it then decides whether to increase or decrease the sanction. ABA Standard 9.1.

Courts of other states have recognized that the ABA standards are a valuable analytical tool for determining the appropriate sanction for misconduct. Four state courts have adopted their own standards patterned after the ABA standards.[2] The courts in at least fourteen other states rely on the ABA standards for guidance in determining sanctions,[3] while another three employ only the aggravating and mitigating factor provisions of the ABA standards.[4] The courts in

---

[2] Alabama Standards for Imposing Lawyer Discipline, Preface; Florida Standards for Imposing Lawyer Sanctions, Preface; North Dakota Standards for Imposing Lawyer Sanctions, Note; Utah Standards for Imposing Lawyer Sanctions, Summary. California, in contrast, has adopted standards containing presumptive sanctions. Cal St B P, tit IV, Standards for Attorney Sanctions for Professional Misconduct.

[3] See *In re Mann*, 853 P2d 1115, 1117 (Alas, 1993); *In re Shannon*, 179 Ariz 52, 71; 876 P2d 548 (1994); *People v Fager*, 938 P2d 138, 141 (Colo, 1997); *Statewide Grievance Comm v Fountain*, 56 Conn App 375, 381; 743 A2d 647 (2000); *In re Maguire*, 725 A2d 417, 423 (Del, 1999); *In re Swindall*, 266 Ga 553, 554; 468 SE2d 372 (1996); *In re Quaid*, 646 So 2d 343, 350 (La, 1994); *Attorney Grievance Comm of Maryland v Sheridan*, 357 Md 1, 28; 741 A2d 1143 (1999); *Mississippi Bar v Land*, 653 So 2d 899, 910 (Miss, 1994); *Office of Disciplinary Counsel v Brown*, 87 Ohio St 3d 316, 319-322; 720 NE2d 525 (1999); *In re Huffman*, 328 Or 567, 587; 983 P2d 534 (1999); *In re Claggett*, 544 NW2d 878, 881 (SD, 1996); *In re Hunter*, 163 Vt 599, 605; 656 A2d 203 (1994); *In re Boelter*, 139 Wash 2d 81, 99; 985 P2d 328 (1999).

[4] *Neal v Hollingsworth*, 338 Ark 251, 263-265; 992 SW2d 771 (1999); *In re Doherty*, 142 NH 446, 450; 703 A2d 261 (1997); *Lawyer Disciplinary Bd v Jarrell*, 523 SE2d 552, 559 (W Va, 1999).

nine additional states have relied on the ABA standards to a lesser extent.[5] Further, in a few states, state disciplinary boards closely follow the ABA standards even though the courts do not. Levin, *The emperor's clothes and other tales about the standards for imposing lawyer discipline sanctions*, 48 Am U L R 1, 34, n 157 (1998).

In Michigan, the ADB executive director began transmitting the ABA standards to hearing panel members for use as an additional resource soon after their promulgation. Cunningham, 1988 Annual Survey of Michigan Law, *Professional Responsibility*, 34 Wayne L R 1005, 1027 (1988). The ADB has not, however, adopted the ABA standards or promulgated any other set of standards. Today, we join the courts of other states in recognizing the value of the ABA standards as a benchmark in the decisional process.

B

This Court has the power under Const 1963, art 6, § 5, to regulate and discipline the members of the bar of this state. *In re Schlossberg*, 388 Mich 389, 395; 200 NW2d 219 (1972);    see also MCL 600.904; MSA 27A.904. Exercising our rulemaking authority, we bifurcated the Michigan attorney disciplinary system in 1978, vesting the investigative and prosecutorial functions in the AGC, and the adjudicative function in

---

[5] See *Office of Disciplinary Counsel v Breiner*, 89 Hawaii 167, 175; 969 P2d 1285 (1999); *In re Burchett*, 630 NE2d 205, 206 (Ind, 1994); *In re Harris*, 261 Kan 1063, 1076; 934 P2d 965 (1997); *In re Luongo*, 416 Mass 308, 311; 621 NE2d 681 (1993); *In re Giberson*, 581 NW2d 351, 355 (Minn, 1998); *In re Weier*, 994 SW2d 554, 559 (Mo, 1999); *In re Carlton*, 993 P2d 736, 738 (NM, 2000); *In re Cutler*, 227 AD2d 8, 10; 650 NYS2d 85 (1996); *Oklahoma ex rel Oklahoma Bar Ass'n v O'Neal*, 852 P2d 713, 715 (Okla, 1993).

the ADB. MCR 9.108(A), 9.110(A).[6] Subchapter 9.100 of the Michigan Court Rules governs attorney disciplinary proceedings before hearing panels and the ADB.

By court rule, we have established the analytical framework that the hearing panel must use in making its decision and have specified the form of the hearing panel's decision.[7] We have also delineated the ADB

---

[6] See Dubin & Schwartz, *Survey and analysis of Michigan's disciplinary system for lawyers*, 61 U Det J Urb L 1, 1-3 (1983), for a discussion of the history of attorney disciplinary proceedings in Michigan and the concerns that prompted this Court to create the AGC and ADB.

[7] MCR 9.115(J) provides:

(1) The hearing panel must file a report on its decisions regarding the misconduct charges and, if applicable, the resulting discipline. The report must include a certified transcript, a summary of the evidence, pleadings, exhibits and briefs, and findings of fact. The discipline section of the report must also include a summary of all previous misconduct for which the respondent was disciplined or admonished.

(2) Upon a finding of misconduct, the hearing panel shall conduct a separate hearing to determine the appropriate discipline. The hearing on discipline shall be conducted as soon after the finding of misconduct as is practicable and may be held immediately following the panel's ruling that misconduct has been established.

(3) If the hearing panel finds that the charge of misconduct is established by a preponderance of the evidence, it must enter an order of discipline. The order shall take effect 21 days after it is served on the respondent unless the panel finds good cause for the order to take effect on a different date, in which event the panel's decision must explain the reasons for ordering a different effective date. In determining the discipline to be imposed, any and all relevant evidence of aggravation or mitigation shall be admissible, including previous admonitions and orders of discipline, and the previous placement of the respondent on contractual probation.

(4) If the hearing panel finds that the charge of misconduct is not established by a preponderance of the evidence, it must enter an order dismissing the complaint.

(5) The report and order must be signed by the panel chairperson and filed with the board and the administrator. A copy must be served on the parties as required by these rules.

MCR 9.117 governs the hearing procedure when the ADB assigns a complaint to a master:

If the board assigns a complaint to a master, the master shall hold a public hearing on the complaint and receive evidence. To

procedures for reviewing a hearing panel decision.[8]

These court rules serve two main purposes. First, they promote considered decision making that accords procedural fairness to the respondent and

---

the extent that MCR 9.115 may be applied, it governs procedure before a master. After the hearing, the master shall prepare a report containing

(1) a brief statement of the proceedings,

(2) findings of fact, and

(3) conclusions of law.

The master shall file the report with a hearing panel designated by the board and serve a copy on the administrator and the respondent. Within 14 days after the report is filed, the administrator or the respondent may file objections to the report and a supporting brief. The panel must determine if the record supports the findings of fact and the conclusions of law and impose discipline, if warranted. Further proceedings are governed by MCR 9.118.

[8] MCR 9.118(A) grants the grievance administrator, the complainant, and the respondent the right to petition the ADB to review a hearing panel order. In response, the ADB shall issue an order to show cause why it should not affirm the hearing panel order. MCR 9.118(B). MCR 9.118(C), (D) govern the hearing before the ADB and the form of the ADB's decision. Under MCR 9.118(C),

(1) A hearing on the order to show cause must be heard by a subboard of at least 3 board members assigned by the chairperson. The board must make a final decision on consideration of the whole record, including a transcript of the presentation made to the subboard and the subboard's recommendation. The respondent shall appear personally at the review hearing unless excused by the board. Failure to appear may result in denial of any relief sought by the respondent, or any other action allowable under MCR 9.118(D).

(2) If the board believes that additional testimony should be taken, it may refer the case to a hearing panel or a master. The panel or the master shall then take the additional testimony and make a supplemental report, including a transcript of the additional testimony, pleadings, exhibits, and briefs with the board. Notice of the filing of the supplemental report and a copy of the report must be served as an original report and order of a hearing panel.

MCR 9.118(D) governs the ADB decision:

After the hearing on the order to show cause, the board may affirm, amend, reverse, or nullify the order of the hearing panel in whole or in part or order other discipline. A discipline order is not effective until 21 days after it is served on the respondent unless the board finds good cause for the order to take effect earlier.

instills public confidence in the disciplinary process. Second, they generate a record that contains the information this Court needs to engage in meaningful review when exercising its ultimate authority to regulate and discipline members of the bar. *Schlossberg, supra* at 395; MCR 9.122. Today, we adopt the ABA Standards for Imposing Lawyer Sanctions on an interim basis to further these purposes.

The basic goal of our disciplinary system is to protect "the public, the courts, and the legal profession." MCR 9.105. While we have emphasized in the past that disciplinary cases "must stand on their own facts,"[9] and that analogies to other cases are of limited value,[10] our statements merely reflect the proposition that no two misconduct cases are identical. Our prior statements clearly do not signal a rejection of the principle that equivalent misconduct should be treated equivalently. Rather, we have stressed that the ADB overview function involves "continuity and consistency in discipline imposed." *In re Daggs*, 411 Mich 304, 320; 307 NW2d 66 (1981).

The difficulty of insuring consistency within the current disciplinary framework has become apparent in recent years. In the year before we bifurcated the disciplinary process, the predecessor disciplinary board received 753 complaints, imposed 62 orders of final discipline, and handled 1,687 matters without opening a file. Final Report State Bar Grievance Board, July 1, 1977—June 30, 1976, 57 Mich B J 1002,

---

[9] *State Bar Grievance Administrator v Del Rio*, 407 Mich 336, 350; 285 NW2d 277 (1979); see also *Grievance Administrator v Deutch*, 455 Mich 149, 166; 565 NW2d 369 (1997) ("attorney misconduct cases are fact-sensitive inquiries that turn on the unique circumstances of each case").

[10] See, e.g., *Grievance Administrator v Rostash*, 457 Mich 289, 298; 577 NW2d 452 (1998), and *In re Grimes*, 414 Mich 483, 490; 326 NW2d 380 (1982).

1005 (1978).  There were about 16,800 members of the bar during this period. *Id.* Over the past twenty years, our bar membership has nearly doubled, 78 Mich B J 712 (1999), and an increase in disciplinary activity has accompanied our increase in numbers. In 1998, the AGC received 3,935 requests for investigation. State of Michigan Attorney Discipline Board & Attorney Grievance Commission, Joint Annual Report, January 1, 1998, to December 31, 1998, p 5. During that year, the AGC filed 241 formal complaints with the ADB, issued 179 confidential admonishments, and closed 342 files with cautionary letters. *Id.* The ADB entered 205 final disposition orders during this same period, among them orders in 47 appeals from hearing panel orders. *Id.*, p 12.

Attorney volunteers serve on hearing panels that make the initial determination of misconduct and appropriate discipline. MCR 9.111. In 1998, the ADB maintained a roster of 450 attorneys who serve on the three-member hearing panels. Joint Annual Report, *supra*, p 10.   While these attorneys undoubtedly attempt to prioritize cases and achieve some degree of consistency in discipline, an individual panel member's attempt is hindered by a lack of information about discipline imposed in other cases.[11] Although the members of the ADB have more information than hearing panel members, the analytical framework established by the ABA standards will assist them in selecting the appropriate discipline in each case. The

---

[11] Although the ADB, through its decisions, has articulated disciplinary ranges for some of the most common misconduct, hearing panel and ADB decisions are not published. ADB decisions from October 1978 through the present are, however, now available on the ADB website, www.adbmich.org, as well as on the Michigan Lawyers Weekly website (Michlaw.com/miadb.htm). Further, ADB decisions from 1988 to the present are available in a computer software package available from the State Bar.

ABA standards will guide hearing panels and the ADB in imposing a level of discipline that takes into account the unique circumstances of the individual case, but still falls within broad constraints designed to ensure consistency.

Standards for imposing lawyer sanctions will help insure that the sanction imposed in a given case advances the basic goal of our disciplinary system. We agree with the remarks contained in the preface to the ABA standards:

> For lawyer discipline to be truly effective, sanctions must be based on clearly developed standards. Inappropriate sanctions can undermine the goals of lawyer discipline: sanctions which are too lenient fail to adequately deter misconduct and thus lower public confidence in the profession; sanctions which are too onerous may impair confidence in the system and deter lawyers from reporting ethical violations on the part of other lawyers. Inconsistent sanctions, either within a jurisdiction or among jurisdictions, cast doubt on the efficiency and the basic fairness of all disciplinary systems.

Use of the ABA standards will further the goal of our disciplinary system because they "combine clear, straight-forward guidelines which ensure a level of consistency necessary for fairness to the public and the legal system with the flexibility and creativity essential to secure justice to the disciplined lawyer." *In re Buckalew*, 731 P2d 48, 52 (Alas, 1986).

Application of the ABA standards will also facilitate our review. This Court has the ultimate responsibility to oversee the conduct of the members of the State Bar. *Grievance Administrator v Rostash*, 457 Mich 289, 297; 577 NW2d 452 (1998); *Grievance Administrator v August*, 438 Mich 296, 304; 475 NW2d 256

(1991). On appeal, this Court "may make any order it deems appropriate, including dismissing the appeal." MCR 9.122(E). Although we have broad authority to change a disciplinary order, we have historically invoked our power "only if the sanction imposed is inappropriate." *Rostash, supra* at 297.[12]

Our review is often hampered by the absence of a clear explanation of the reasons for selecting a particular sanction. Reference to the ABA standards will lead to well-reasoned decisions that will facilitate meaningful review. We therefore direct the ADB and hearing panels to follow the ABA standards in determining the appropriate sanction for lawyer misconduct.[13]

---

[12] Our court rules authorize the ADB to review the hearing panel's decision de novo. MCR 9.118(D). This Court, in turn, has broad authority to change the ADB disciplinary order. MCR 9.122(E). We nonetheless employ different standards of review depending on the nature of the issue raised by the parties. As always, we review questions of law de novo. See, e.g., *Deutch*, n 9 *supra* (considering whether hearing panels have the authority to dismiss disciplinary proceedings at an initial misconduct hearing when the Grievance Administrator provides proof of a violation of MCR 9.104[5]). In contrast, we review the ADB finding of misconduct to determine whether proper evidentiary support exists on the whole record. *Grimes*, n 10 *supra* at 490. This standard is akin to the clearly erroneous standard we use in reviewing a trial court's findings of fact in civil proceedings. See MCR 2.613(C). Finally, in practice, we grant some deference to the ADB determination of the appropriate sanction because we will change the order only if the sanction imposed is inappropriate. *Rostash, supra* at 297. Use of the ABA standards by the ADB and hearing panels, however, may justify a more deferential standard for reviewing the ADB sanction decision. In light of our decision to adopt the ABA standards, we will consider amending MCR 9.122(E) to afford greater deference to the ADB determination of the appropriate sanction for lawyer misconduct.

[13] We caution the ADB and hearing panels that our directive to follow the ABA standards is not an instruction to abdicate their responsibility to exercise independent judgment. Where, for articulated reasons, the ADB or a hearing panel determines that the ABA standards do not adequately consider the effects of certain misconduct, do not accurately address the aggravating or mitigating circumstances of a particular case, or do not comport with the precedent of this Court or the ADB, it is incumbent on the ADB or the hearing panel to arrive at, and explain the basis for, a sanction or result that reflects this conclusion.

II. *LOPATIN*

A. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

This case arises from respondent's allegedly improper contact with Court of Appeals Judges S. Jerome Bronson and Richard M. Maher. The AGC filed a formal complaint in September 1992, alleging misconduct involving (1) respondent's gifts to, and services for, Judge Maher and the failure to disclose those gifts and services (count I); (2) respondent's contact with Judge Maher regarding pending cases in which respondent did not represent a party (count II); (3) respondent's ex parte contact with Judge Bronson in the matter of *Luszczynski v Henry Ford Hosp*, Court of Appeals No. 84686 (count III); (4) respondent's boasting of his influence with Court of Appeals judges (count IV); and (5) respondent's attempt to persuade attorney Sue Radulovich to represent his secretary during a grand jury investigation into his conduct involving Judge Bronson in an attempt to obtain information regarding the secret proceedings (count V).

A hearing panel presided over a misconduct hearing during late 1994 and early 1995.[14] The panel orally advised the parties of its decision in February 1995, and issued a written report on June 7, 1995. Regarding count I, the panel determined that respondent violated DR 7-110(A)[15] by giving or lending items or ser-

---

[14] A discovery dispute that generated two applications for leave to appeal to this Court delayed the hearing in this matter.

[15] The 1971 Code of Professional Responsibility and Canons govern this case because the acts underlying the allegations of misconduct occurred before the effective date of the Michigan Rules of Professional Conduct. DR 7-110(A) stated that "[a] lawyer shall not give or lend anything of value to a judge, official, or employee of a tribunal."

vices of value to Judge Maher. It found, however, that respondent did not make the gifts to influence Judge Maher's decisions in cases important to respondent's law firm. The panel further determined that respondent violated DR 1-102(A)(5)[16] and MCR 9.104(1)[17] by failing to disclose to opposing counsel in a case pending in the Court of Appeals his law firm's representation of Judge Maher and Judge Maher's daughter in an unrelated personal injury suit. Finally, the panel found that respondent violated DR 1-102(A)(1), (5), and (6),[18] DR 7-110(B),[19] and MCR 9.104(1)-(4)[20] by causing a copy of a memorandum prepared by an

---

[16] DR 1-102(A)(5) provided that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice."

[17] MCR 9.104(1) provides that "conduct prejudicial to the proper administration of justice" is grounds for discipline.

[18] DR 1-102(A) provided that a lawyer shall not:

    (1) Violate a Disciplinary Rule.

    (2) Circumvent a Disciplinary Rule through actions of another.

    (3) Engage in illegal conduct involving moral turpitude.

    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

    (5) Engage in conduct that is prejudicial to the administration of justice.

    (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

[19] DR 7-110(B) provided:

In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

    (1) In the course of official proceedings in the cause.

    (2) In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.

    (3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.

    (4) As otherwise authorized by law.

[20] MCR 9.104(1)-(4) provide:

The following acts or omissions by an attorney, individually or in concert with another person, are misconduct and grounds for disci-

associate for the case of *Luszczynski v Henry Ford Hosp* to be sent to Judge Bronson without notice to opposing counsel and the other judges on the panel.[21]

---

pline, whether or not occurring in the course of an attorney-client relationship:

   (1) conduct prejudicial to the proper administration of justice;

   (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;

   (3) conduct that is contrary to justice, ethics, honesty, or good morals;

   (4) conduct that violates the standards or rules of professional responsibility adopted by the Supreme Court . . . .

[21] The hearing panel found as follows:

The panel heard testimony from respondent, Judge ROMAN GRIBBS, Judge MARTIN CLEMENTS, Monica Linkner, Ronald Dzierbicki, and Robert Rathke on this issue.

The panel finds, after hearing all testimony, that respondent argued the case of *Luszczynski v Henry Ford Hospital*, Court of Appeals #84686 in front of Court of Appeals Judge S. Jerome Bronson, ROMAN GRIBBS, and MARTIN CLEMENTS. Respondent testified that Judge Bronson, in the interest of expediting oral arguments, asked respondent to brief two new cases which had been decided by the Supreme Court after briefs were filed in the *Luszczynski* case. Monica Linkner, an attorney in respondent's law firm, prepared a written memorandum addressed to Albert Lopatin. In it, she recapped what had occurred at oral argument, and discussed the new Supreme Court cases which respondent had brought to the Court's attention during orals.

Mr. Rathke testified that Judge Bronson gave him a handwritten memorandum to be used in drafting the *Luszczynski* opinion. Rathke testified that it was the only time Judge Bronson had ever given him any type of written document from which to draft an opinion.

Judge Bronson's handwritten memorandum and the memorandum written by Linkner appear to be one in the same document. The language is almost identical and there is the same mistaken citation of a court rule appearing in both documents.

Testimony indicates that respondent's memorandum was not properly served on the Court, the other panel judges or opposing counsel. There is no proof of service in the Court file, or in respondent's file, and Judge GRIBBS and Judge CLEMENTS both testified that they had never received the memorandum.

The panel finds that Mr. Lopatin caused a copy of the memorandum prepared by Linkner to be sent or otherwise communicated to Judge Bronson without proper notice to opposing counsel and the other panel members. Accordingly, the panel finds a violation of

The panel rejected the remaining allegations in the complaint. Considering the nature of the misconduct and some of the aggravating and mitigating factors identified in the ABA standards, the hearing panel reprimanded respondent for the misconduct.

Respondent and the Grievance Administrator petitioned the ADB for review of the hearing panel decision. In February 1996, the ADB modified the hearing panel's first finding of misconduct, reversed the second finding, and affirmed the third finding. Regarding the panel's first finding, the ADB affirmed the panel's determination that respondent's renting of his Florida condominium to Judge Maher at a reduced rate constituted an improper gift. The ADB agreed with the hearing panel that a reprimand was the appropriate discipline for the misconduct.

The Grievance Administrator applied for leave to appeal to this Court. Petitioner applied for leave to appeal as cross-appellant. In lieu of granting the applications, we remanded to the hearing panel for (1) findings regarding the credibility of three witnesses, (2) resolution of count II of the formal complaint, (3) a finding whether Judge Bronson, in open court, directed respondent to deliver the memo and to deliver it without serving opposing counsel or filing it with the clerk, (4) an explanation of the panel's finding that respondent did not intend to influence Judge Maher's decisions, (5) reconsideration of any findings affected by evidence of attorney Radulovich's prior consistent statements, which the panel erroneously excluded. We further advised that the panel could exercise its discretion to reopen proofs if it deter-

---

MCR 9.104(1-4) and Canons 1 and 7 of the ten applicable Code of Professional Responsibility, [DR 1-102(A)(1, 5, 6) and DR 7-110(B)].

mined that the improperly excluded evidence would be decisive. We also directed the panel to consider whether any changed findings would affect the level of discipline.

On remand, the hearing panel found that attorney Radulovich was the least credible of the three major witnesses (Radulovich, respondent, and Judge Maher). It therefore declined to base a finding of misconduct on her uncorroborated testimony. The panel, in contrast, found that respondent was fairly credible, except for his testimony regarding Judge Bronson's statements during oral argument. The panel further found Judge Maher credible.

The hearing panel also expanded on its findings regarding respondent's gifts to Judge Maher. It found that respondent did not intend to influence, directly or indirectly, Judge Maher's decisions by giving him gifts. The panel further determined that petitioner failed to prove the allegations in count II.

Finally, the panel expanded on its findings regarding respondent's ex parte communication with Judge Bronson. The panel rejected respondent's testimony that Judge Bronson stated from the bench that respondent could serve the memo on him alone and he would forward it to the other judges and parties. It found that respondent's testimony was incredible on its face, was inconsistent with his associate's memo and her testimony, clashed with Judge GRIBBS' testimony, and conflicted with his firm's established filing procedures. The panel further observed that the Clerk of the Court of Appeals, Ronald Dzierbicki, essentially testified that he would have heard if Judge Bronson had made the statement because it would have been unusual. The panel found that, even if Judge Bronson occasionally directed counsel to send briefs to him, he would not have agreed to serve the brief on oppos-

ing counsel. The panel further noted that its finding that an ex parte communication had occurred was supported by respondent's admission that he "was following his instructions, what he said at oral argument." The panel also reiterated its dismissal of the remaining two counts in the complaint.[22] The panel concluded that its additional findings regarding the ex parte communication justified a different sanction—a suspension for forty-five days.

Respondent subsequently moved for this Court to strike the section of the hearing panel report that addressed the level of discipline. He also requested a stay of the panel's order.

In a December 9, 1997, order, we denied petitioner's application for leave to appeal because we were "not persuaded that the questions presented should be reviewed by this Court." In lieu of granting either respondent's application for leave to appeal or motion to strike, we remanded the case to the ADB for consideration of respondent's arguments regarding the increased discipline, except for his argument that hearing panel action exceeded the scope of the remand order. We denied respondent's application and motion in all other respects. We also stayed imposition of discipline until further order of the ADB.

On remand, the ADB affirmed the hearing panel's additional findings. It determined, however, that this Court's "dismissal" of the Grievance Administrator's application for leave to appeal precluded it from suspending respondent for more than forty-five days. The ADB concluded that a reprimand was the appropriate sanction for respondent's misconduct. Two ADB mem-

---

[22] The hearing panel's complete findings regarding count III are attached to this opinion as an appendix.

bers dissented, explaining that they would have affirmed the hearing panel.

We granted the Grievance Administrator's application for leave to appeal. 461 Mich 1206 (1999).

### B. APPROPRIATE SANCTION FOR THE MISCONDUCT

The Grievance Administrator's challenge involves the ADB finding of misconduct on the basis of respondent's ex parte contact with Judge Bronson. We ordinarily review hearing panel and ADB findings to determine whether proper evidentiary support exists on the whole record to support the findings. *In re Grimes*, 414 Mich 483, 490; 326 NW2d 380 (1982); *State Bar Grievance Administrator v McWhorter (On Rehearing)*, 407 Mich 278, 291; 284 NW2d 472 (1979). Neither the Grievance Administrator nor respondent challenges the finding of misconduct by the hearing panel as adopted by the ADB. We conclude nonetheless that ample evidence supports the ADB finding that respondent violated DR 1-102(A)(1), (5), and (6), DR 7-110(B), and MCR 9.104(1)-(4) by engaging in improper ex parte contact with Judge Bronson.

We further conclude that the ADB erred as a matter of law when, in determining the appropriate sanction for the misconduct, it concluded that our prior order denying the Grievance Administrator's application for leave to appeal precluded a suspension of longer than forty-five days. In light of that error, and because the ADB acted without the benefit of our guidance regarding use of the ABA Standards, we remand this case to the ADB for reconsideration of the appropriate discipline for respondent's misconduct.

### 1. HEARING PANEL AND ADB DECISIONS

In its initial decision, the hearing panel repri-
manded respondent for the misconduct. It explained:

> [T]he panel is also persuaded that, while in all instances,
> ex-parte communication must be avoided, that in this
> instance respondent should be reprimanded only, for the
> following reasons. First, testimony indicates (and is not
> rebutted) that the memorandum submitted to Judge Bron-
> son discussed the two cases that had been presented on the
> oral record. . . . Respondent testified that he brought new,
> pertinent Supreme Court cases to the panel's attention at
> oral argument and presumably in the presence of opposing
> counsel. Further, the memorandum could not have had an
> impact on Judges GRIBBS and CLEMENTS since they had not
> seen the memorandum and they had taken positions on the
> case before the memorandum was delivered to Judge
> Bronson.
>
> The panel is also troubled by the remoteness of the inci-
> dent complained of by the Grievance Administrator and the
> dearth of "hard evidence," i.e. a transcript to implicate
> respondent. The panel comes to its conclusion of ex-parte
> communication by virtue of circumstantial evidence. Still,
> the panel believes that ex-parte communication is not a triv-
> ial matter and though no new information was imparted to
> Judge Bronson, such an occurrence is harmful to the integ-
> rity of the judicial process.
>
> The panel, in imposing a reprimand, also considered
> respondent's previously unblemished record over a long and
> distinguished career.

*      *      *

In addition to the nature of the misconduct established in
this case, the panel has considered the factors identified as
aggravating or mitigating by the American Bar Association's
*Standards for Imposing Lawyer Sanctions.* While it is true
that the respondent has substantial experience in the prac-

tice of law [Standard 9.22(i)], we do not find that this factor has any significant aggravating effect in this case. On the other hand, the mitigating factors present in this case are: Absence of a prior disciplinary record [Standard 9.32(a)]; Absence of a dishonest or selfish motive [Standard 9.32(b)]; and the passage of as much as thirteen years between some of the events charged and the filing of the formal complaint [Standard 9.32(i)]. We therefore conclude that a reprimand is the maximum discipline which is warranted in this case.

The ADB affirmed the panel's decision:

[W]e agree with the panel that the respondent's conduct was not a trivial matter and although no new information was imparted to Judge Bronson, such an occurrence is harmful (or potentially harmful) to the integrity of the judicial process. However, we also share the panel's concern for the remoteness of the incident and the dearth of "hard evidence" in support of this count and we adopt the panel's findings that the misconduct in this case is substantially mitigated by respondent's previously unblemished record over a long and distinguished career; the absence of a finding that he acted out of dishonest or selfish motives and the passage of as much as years between some of the events charged and the filing of the formal complaint. We agree that a reprimand is the maximum discipline which is warranted in this case.

On remand, however, the hearing panel revisited the sanction issue in light of its additional findings. The panel also considered the Grievance Administrator's argument that, under ABA Standard 6.31(b),[23] disbarment is the appropriate sanction for the miscon-

---

[23] ABA Standard 6.31(b) states that disbarment is generally appropriate when a lawyer "makes an ex parte communication with a judge or juror with intent to affect the outcome of the proceeding, and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding . . . ."

duct. The panel further recognized that ABA Standard 6.32[24] suggests that a suspension is the appropriate sanction for some improper ex parte communications. In this case, the panel determined that a forty-five-day suspension was the appropriate discipline:

> We do not wish to dwell too much upon the actual or potential injury to a party or the actual or potential effect on the proceeding. Every unlawful *ex parte* communication on the merits is injurious to the integrity of the legal system and must be taken seriously. Nonetheless, the *Standards* do provide for gradations. Here, we find it difficult to determine whether the memo was the cause of any actual or potential injury or interference in the outcome. This is in part because the evidence indicates that Judge Bronson may have reassigned the case to himself prior to receiving the memo. Also, the decision making power is diffused in the Court of Appeals, and one of the three Judges was leaning in Judge Bronson's direction at the post-oral argument conference.
>
> Additionally, we consider that the substance of the memorandum had been presented in open court with opposing counsel present. This does not excuse the improper *ex parte* contact or diminish the significance of the fact that opposing counsel was not given the opportunity to respond in like kind to the arguments therein. However, as compared to an *ex parte* communication which raises an entirely new analysis or presents a resolution of issues to which opposing counsel was not privy, we find this type of communication somewhat less harmful to the system and the party aggrieved.
>
> We find that the facts of this case fall more clearly in section 6.32 of the *Standards* than in section 6.31(b). Moreover cases cited in the Attorney Discipline Board's opinion in *Grievance Administrator v Sheldon L. Miller*, ADB No

---

[24] ABA Standard 6.32 states that "[s]uspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding."

90-134-GA (ADB 1991), and *Florida Bar v Mason,* 334 So 2d
1 (Fla 1976), support the imposition of a suspension rather
than disbarment. Two of the cases cited in *Miller* impose 30
day suspensions for multiple offenses including an *ex parte*
contact and false or less than candid statements to conceal
it. In the absence of mitigating factors, we think that may
be too lenient under such circumstances.

We have considered the imposition of a suspension of
sufficient duration to require reinstatement proceedings.
However, we have determined that in these particular cir-
cumstances, which include the nature of the *ex parte* com-
munication and its potential to affect the proceedings, the
remoteness in time of this apparently isolated incident, and
respondent's lengthy and unblemished record as a member
of the bar, a suspension of 45 days is appropriate.

On remand from this Court to consider the
increased discipline, the ADB initially concluded that
our denial of the Grievance Administrator's applica-
tion for leave to appeal precluded it from suspending
respondent for more than forty-five days. Considering
the options of affirming the hearing panel's decision,
reducing the suspension to a period of not less than
thirty days,[25] and reprimanding respondent, the ADB
elected to adhere to its prior decision to reprimand
respondent.

The ADB explained the basis for its determination:

Since the panel's original order of reprimand in June
1995, this case has twice made its way to the Supreme
Court and is now before the Board a second time. While the
panel's findings with regard to count 3 have been more fully
explicated and respondent's culpability brought into sharper
focus, the passage of time has not changed the fundamental
nature of that misconduct or the substantial mitigation pre-
viously recognized by the panel and the board. We are una-

---

[25] See MCR 9.106(2).

ble to conclude that a forty-five day suspension of respondent's license will provide a significantly higher degree of protection to the public, the courts or the legal profession as a deterrent to respondent or other attorneys. On the contrary, a short suspension imposed twelve years after the misconduct would, in our opinion, be primarily, if not exclusively, punitive in nature.

We stress that respondent's misconduct is worthy of condemnation by the legal profession. However, bearing in mind that the ex-parte memorandum which is the subject of count 3 was submitted to Judge Bronson in early June 1986 and considering both the extended history of this case and respondent's unblemished record during the intervening years, we now conclude that the public, the courts, the legal profession, and the parties and their counsel will be served by an order bringing this matter to a close.

## 2. LAW OF THE CASE

Our prior order denying the Grievance Administrator's application for leave to appeal as cross-appellant did not preclude the ADB from increasing the level of discipline beyond the forty-five-day suspension imposed by the hearing panel.

We reject respondent's argument that our prior order denying the Grievance Administrator's application for leave to appeal constitutes the law of the case. Under the law of the case doctrine, "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same." *CAF Investment Co v Saginaw Twp*, 410

Mich 428, 454; 302 NW2d 164 (1981).[26] The appellate court's decision likewise binds lower tribunals because the tribunal may not take action on remand that is inconsistent with the judgment of the appellate court. *Sokel v Nickoli*, 356 Mich 460, 465; 97 NW2d 1 (1959). Thus, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals. *Webb v Smith (After Second Remand)*, 224 Mich App 203, 209; 568 NW2d 378 (1997); see, generally, 5 Am Jur 2d, Appellate Review, § 605, p 300.

Law of the case applies, however, only to issues actually decided, either implicitly or explicitly, in the prior appeal. *Webb, supra* at 209; *Roth v Sawyer-Cleator Lumber Co*, 61 F3d 599, 602 (CA 8, 1995). In denying the Grievance Administrator's application for leave to appeal in this case, we expressed no opinion on the merits. See *Frishett v State Farm Mut Automobile Ins Co*, 378 Mich 733 (1966) (order); cf. *Teague v Lane*, 489 US 288, 296; 109 S Ct 1060; 103 L Ed 2d 334 (1989) (the denial of a writ of certiorari imports no expression of opinion on the merits of the case). Therefore, the law of the case doctrine does not apply.[27] See *Mirchandani v United States*, 836 F2d 1223, 1225 (CA 9, 1988).

---

[26] The "doctrine exists primarily to 'maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.' " *Locricchio v Evening News Ass'n*, 438 Mich 84, 109; 476 NW2d 112 (1991), quoting Wright, Miller & Cooper, Federal Practice & Procedure, § 4478, p 788. It is premised on a need for finality of judgment and the want of jurisdiction of an appellate court to modify its judgment except on rehearing. *Johnson v White*, 430 Mich 47, 53; 420 NW2d 87 (1988).

[27] The dissent erroneously analogizes this case to *Johnson*, n 26 *supra*. In *Johnson*, this Court's denial of the application for leave to cross appeal had no effect on the application of the law of the case doctrine. Even if the plaintiff in *Johnson* had not applied for leave to cross appeal, the law of the case doctrine would have barred the Court of Appeals from revisiting the issue on remand because the Court had decided the issue in its ini-

In this case, the ADB was free on remand to consider and decide any matters left open by our mandate. See *Sokel, supra* at 465; cf. *Quern v Jordan,* 440 US 332, 347, n 18; 99 S Ct 1139; 59 L Ed 2d 358 (1979). We remanded in this case "for consideration of arguments by the respondent concerning the appropriateness of the increased level of discipline ordered by the hearing panel, with the exception of arguments that the action exceeded the scope of remand." 456 Mich 1206-1207 (1997). Thus, as in all cases in which it reviews a hearing panel order of discipline, the ADB could "affirm, amend, reverse, or nullify the order of the hearing panel in whole or in part or order other discipline." MCR 9.118(D). Accordingly, the ADB erroneously concluded that our order precluded it from increasing the level of discipline beyond the forty-five-day suspension imposed by the hearing panel.

### 3. REVIEW OF SANCTION IMPOSED BY THE ADB

The Grievance Administrator urges us to increase the level of discipline imposed by the ADB for respondent's misconduct. We invoke our authority under MCR 9.122(E) to change a disciplinary order only if the sanction imposed by the ADB is inappropriate. *Rostash, supra* at 297. In this case, however, the ADB erroneously concluded that our prior order limited the disciplinary options. Further, the ADB did not have

tial opinion and the facts remained materially the same. *CAF Investment Co, supra* at 454. In this case, in contrast, the intermediate appellate tribunal, the ADB, did not review the hearing panel decision to impose a forty-five-day suspension before this Court entered the order remanding this case. Moreover, to the extent that the ADB's initial decision to reprimand respondent could be construed as rejecting the options of suspension or disbarment, law of the case would not preclude the ADB from revisiting those issues because, in light of the hearing panel's additional findings and modification of the sanction, the facts are materially different. *Id.*

the benefit of our guidance regarding use of the ABA standards. We therefore remand this case to the ADB for reconsideration of its decision regarding the appropriate level of discipline in light of the ABA standards. On remand, the ADB may consider all sanction options, including disbarment.

ABA Standards 6.31(b) and 6.32 discuss the circumstances under which misconduct involving an ex parte communication with a judge warrants a suspension or disbarment. The ADB, of course, is not bound by the hearing panel's application of the standards, particularly its assessment whether the ex parte communication caused serious injury or potentially serious injury to a party, or caused significant interference or potentially significant interference with the outcome of the legal proceeding. We are troubled by the hearing panel's narrow focus on the preliminary voting decisions of the other members of the Court of Appeals panel, without regard for the effect of a strongly reasoned proposed opinion on their decision whether to join Judge Bronson's opinion. In addition to potentially altering the Court of Appeals decision, an ex parte communication that affects the reasoning of the opinion may also injure a party by necessitating the expenditure of additional resources to obtain relief from this Court.

The ADB should also consider the harm to the administration of justice caused by respondent's misconduct. Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3d ed), § 5.01, pp 159-160, describes the dangers associated with ex parte communications:

> *Ex parte* communications deprive the absent party of the right to respond and be heard. They suggest bias or partiality on the part of the judge. *Ex parte* conversations or correspondence can be misleading; the information given to

the judge "may be incomplete or inaccurate, the problem can be incorrectly stated." At the very least, participation in *ex parte* communications will expose the judge to one-sided argumentation, which carries the attendant risk of an erroneous ruling on the law or facts. At worst, *ex parte* communication is an invitation to improper influence if not outright corruption.

### III. CONCLUSION

Today, we adopt the ABA standards on an interim basis and direct the ADB and hearing panels to use them in determining the appropriate sanction for lawyer misconduct. In this case, we hold that the ADB erroneously concluded that our prior order prevented it from increasing the level of discipline beyond the forty-five-day suspension imposed by the hearing panel. We therefore remand this case to the ADB for reconsideration of its decision regarding the appropriate sanction for respondent's misconduct.

WEAVER, C.J., and TAYLOR, YOUNG, and MARKMAN, JJ., concurred with CORRIGAN, J.

### APPENDIX

#### V. COUNT III: EX PARTE SUBMISSION TO JUDGE BRONSON

#### A. INTRODUCTION AND PROCEDURAL HISTORY.

##### 1. THE ALLEGATIONS AND RESPONDENT'S DEFENSE.

Count III of the formal complaint alleges that

"in a case entitled *Luszczynski v Henry Ford Hospital*, Court of Appeals No. 84686, (Decided 1986) in which

Respondent represented the plaintiff, following oral argument on the appeal and prior to the issuance of an opinion by the court, Respondent directed Monica Farris Linkner, an attorney employed by his law firm, to prepare a draft opinion/memorandum of law regarding issues in *Luszczynski* and caused or permitted the memorandum, or information contained within it, to be given or communicated, *ex parte*, to the late Court of Appeals Judge S. Jerome Bronson, who was assigned to write the opinion. Portions of Ms. Linkner's memorandum were, in fact, incorporated into the Court of Appeals opinion authored by Judge Bronson. [Formal Complaint, ¶ 15.]"

This conduct was alleged to violate Canon 7 of the then applicable Code of Professional Responsibility, DR 7-110(B), and other rules.

At the hearing, respondent testified that Judge Bronson truncated respondent's argument regarding recently decided cases, saying "Submit a memorandum . . . and I'll see that the proper parties get a copy of it."

In our report, we found:

"that Mr. Lopatin caused a copy of the memorandum prepared by Linkner to be sent or otherwise communicated to Judge Bronson without proper notice to opposing counsel and the other panel members. [Report, pp 14-15.]"

We then imposed a reprimand.

2. REMAND.

The Supreme Court's order remanding this matter states in pertinent part:

"The panel did not resolve the issue of whether Judge Bronson, in open court, directed respondent to deliver to Judge Bronson the Linkner memorandum and whether that delivery was to be made without service of a copy of the memorandum on opposing counsel and filing a copy with the clerk of the court. *On remand, the panel shall make specific findings of what, if anything, Judge Bronson said in*

*open court.* [MSC order of 1/28/97, pp 1-2; emphasis added.]"

### 3. PANEL FINDINGS ON MISCONDUCT.

In our original report we found that respondent submitted an *ex parte* communication to Judge Bronson in violation of DR 7-110(B) even though it contains an exception for communications "otherwise authorized by law." (Perhaps this exception was the basis for the Grievance Administrator's concession that, if Bronson had said what was claimed, then respondent should not be disciplined [Tr 1493-1494].)

Rulings from the bench gave a hint as to our resolution of the conflicting evidence. At page 1533 the panel chair stated:

"[*Panel Chair*]: Our finding was based on the responsibility of counsel to serve it on the other side and to serve it on judges, whether or not Judge Bronson had said that.

"And we also gave weight to the fact that neither Judge GRIBBS nor Judge CLEMENTS remembered him saying that. And they both said they would have remembered if that were the case."

A few moments later, at pages 1543-44 of the transcript, the panel chair and respondent's counsel had the following colloquy:

"*Mr. Miller*: But will we have your findings of fact in relation to that particular issue?

"For example, will there be a finding as to whether judge Bronson said, "Give me—File it with me?"

"[*Panel Chair*]: *We have concluded that that was not said. And I think that's already in the record.*

"*Mr. Christensen*: My understanding was that your ruling was that even if it was said, that there was an independent responsibility—

"[*Panel Chair*]: (Interposing) That's true also. [Tr 1533,
1543-1544; emphasis added.]"

It is now apparent to us that our report could be viewed
as:

"(1) disagreeing with the Administrator's legal conclusion
that Bronson's statement, if it had been made, would exon-
erate respondent (Tr 1493-1494);
"(2) finding that, even if Bronson said what respondent
claimed, in light of the fundamental duty to provide notice
to your opponent one could reasonably interpret Bronson's
promise to get the memo to the "proper parties" as includ-
ing only judges and court staff, and not opposing counsel;
or
"(3) an outright rejection of respondent's testimony as to
what Bronson said from the bench."

We now clarify that we rely on each of these independent
grounds for our finding that misconduct occurred. After our
review of the evidence and our specific finding that Bron-
son did not make the remarks claimed by respondent, we
have determined that respondent should be suspended for
45 days.

### B. GENERAL FINDINGS OF FACT.

The appeal in *Luszczynski v Henry Ford Hospital* arose
out of a case in which the plaintiff in a case tried by
respondent received a no cause verdict. On appeal, plaintiff
claimed instructional error by the trial judge. The appeal
was assigned to a panel made up of Judges Jerome Bronson
(presiding), ROMAN GRIBBS, and MARTIN CLEMENTS (a Lapeer
Circuit Judge). The case was argued on May 6, 1986 (Tr 555
[Rathke]; exhibit o [CLEMENT'S (sic) file which includes
docket]). Respondent's associate, Monica Farris-Linkner,
was assigned to do the appellate briefing (Tr 466 [Lopatin];
Tr 1243 [Linkner]). Respondent did the oral argument (Tr
467, 1243). The opinion was released in September, 1986 (Tr
555; exhibit o).

Judge CLEMENTS, Bronson's law clerk (Robert Rathke), and the former Clerk of the Court of Appeals (Ronald Dzierbicki) all testified as to the normal procedure for assigning opinion-writing duties. The judges are listed on a docket or case call in some order such as presiding first, and the next two by seniority. The cases were then assigned to judges in rotation. Judge CLEMENTS, Mr. Rathke, and the records kept by Judge CLEMENTS clearly establish that Judge CLEMENTS was assigned by this random method to write *Luszczynski.*

At the post-oral argument conference between the judges on the panel, the judges discussed their initial impressions: Judge CLEMENTS leaned toward affirmance; Judges Bronson and GRIBBS leaned the other way. The testimony of CLEMENTS and Rathke establishes that soon after oral argument (perhaps at the post-oral argument conference) Judge Bronson told Judge CLEMENTS that he would draft the majority opinion. Mr. Rathke, Judge CLEMENTS, and Mr. Dzierbicki established that the custom was for the assigned writer to do the first draft even if he or she ended up in the minority after the conference. *Luszczynski* was the only exception. Mr. Dzierbicki was asked if he would characterize Bronson as someone who sought out extra work, and he replied "no" (Tr 685).

After Judge Bronson committed suicide, an investigative task force was formed. While executing a grand jury subpoena, Dennis G. Kapelanski, of the Michigan Attorney General's Office, found exhibits I and J in the Lopatin, Miller law office (stipulation at Tr 1292-1293).

Exhibit I is an original, and J is a copy, of a memorandum which reads in part:

"*MEMO*

"TO:      Albert Lopatin
"FROM:    Monica Linkner
"RE:      Edward Luszczynski v Henry Ford Hospital

"Albert, as you asked me to do on the way back from oral argument on Luszczynski, I have once again gone over the briefs and have done some reflecting on oral argument itself. It is really difficult for me to imagine that we would

lose this appeal . . . Here are my thoughts on each of the issues."

\*    \*    \*

[Exhibits I and J.]

The memo continues in an informal tone and discusses the two issues presented in the appeal.

Exhibit K is a memorandum written in Judge Bronson's hand (Tr 536, 539 [Rathke]). Judge Bronson gave it to Mr. Rathke and told him to incorporate it into the opinion. This was a unique request. (Tr 536.) The Bronson memo contains many similarities to the Linkner memo (exhibits I & J), as well as some verbiage directly from the Linkner memo. For example, in their respective discussions of "Issue I," both memos refer to *Moody v Pulte Homes, Inc*, 423 Mich 150 [378 NW2d 319] (1985), and state that there the Supreme Court "emphasized the mandatory requirement of GCR 516.1 (now MCR 2.56[A][4]) [sic] requiring that the court *shall* inform the attorneys of its proposed action on the requests before their arguments to the jury." (See exhibits I, J, and K.[8])

At the hearing in this matter, Respondent testified that he attempted to advise the Court of Appeals panel in *Luszczynski* of two cases decided after Ms. Linker [sic] filed her brief:

"*Q.* And did you advise the court of those two cases?

"*A.* I attempted to hand them to Judge Bronson, who was the presiding judge.

"At that time he said, 'We can't take the time to read it now. *Submit a memorandum in regard to what they stand for and I'll see that the proper parties get a copy of it.*' [Tr 468; emphasis added.]"

At pages 468-471 of the transcript respondent testified as follows:

---

[8] The Bronson memo drops one "the" and one right parenthesis, but is otherwise identical to the quoted language.

"(1) he discussed the type of memo requested by Judge Bronson with Ms. Linkner on the way back from oral argument and 'he left it for her to prepare a memo pursuant to what Judge Bronson had requested' (Tr 468);

"(2) the Linkner memo is the memorandum she prepared pursuant to Judge Bronson's request and her conversation with respondent (Tr 469);

"(3) he 'looked at the memo . . . [and] said it was fine' (Tr 469);

"(4) he 'left it up to her to get it delivered' or he 'could have arranged for delivery of it to the Court of Appeals' (Tr 469);

"(5) he expected the memo to be delivered to Judge Bronson directly (Tr 470);

"(6) no arrangements were made to have the memo delivered to opposing counsel because of Judge Bronson's instructions (Tr 470)."

Neither Judge CLEMENTS nor Judge GRIBBS had ever seen the Linkner memo (exhibits I & J) (Tr 1011, 1159). Mr. Rathke had no recollection of receiving anything from the parties after oral argument (Tr 543). It was not referenced in the Court of Appeals' Docket (exhibit O). Respondent and his counsel stipulate that Judge Bronson had the Linkner memo (Tr 1363). Respondent's testimony is consistent with all of the other evidence establishing that he did not file a copy of the memo with the Court clerk or serve it on Judge GRIBBS, Judge CLEMENTS, or opposing counsel.

"*Q.* And what arrangements, if any, would be made to deliver it to opposing counsel?

"*A.* There wasn't. He indicated that, 'you get the memo to me and I'll see that the proper parties get a copy of same.'

"*Q.* And, sir . . .

"*A.* (Interposing) *That meant to me that whoever was entitled to see the memo, he would see that they got it. And I was following his instructions, what he said at oral argument.* [Tr 470; emphasis added.]"

This is consistent with Ms. Linkner's testimony that she did not see a proof of service or transmittal letter in the file which would indicate that her memo was filed with the court or served on counsel or judges; she worked with the

file quite a bit after oral argument, because there was a motion for costs, a motion for rehearing, and an application for leave to the Supreme Court (Tr 1257, 1259-1260; exhibit O [docket]).

When asked if he had called Judge Bronson between the time of oral argument and the time the *Luszczynski* panel issued its opinion, respondent testified: "Not that I recall. I don't think I ever called him on the telephone" (Tr 473). He did, however, run into Judge Bronson at a party for Judge JESSICA COOPER, but he doesn't know when that was (Tr 473). And, he had lunch with Judge Bronson at some point to discuss Judge Bronson's reelection (Tr 474). However, he did not know when that was. But, he testified: "I don't think the case was before him. That case was not before him at that time." (Tr 475.)

After respondent stepped down from the stand, Judge Bronson's clerk, Robert Rathke, was called. He testified that he took a phone message from respondent during the time he was actually drafting the *Luszczynski* opinion, and thought it was "an amazing coincidence" (Tr 540, 545).

Mr. Rathke also identified exhibit L as containing Judge Bronson's handwriting (Tr 541). Exhibit L is a "month at a glance" calendar for 1986. It was obtained "from Judge Bronson's widow"); it contained a scrap of paper with respondent's phone number on it (stipulation at Tr 1293-1294). On June 9, 1986 the calendar says, "12 noon—Albert for lunch." After Mr. Rathke identified Judge Bronson's handwriting and the Administrator had moved onto exhibit O (Judge CLEMENTS' file), the panel chair elicited some stipulations to move the proofs along, including the stipulation from respondent's counsel that respondent had lunch with Judge Bronson during the relevant period.[9]

_____

[9] As to the lunch issue:

"[*Panel Chair*]: There are things here that I don't think are in dispute.

"We obviously haven't seen the two calendars that have been referred to. But my suggestion is that if you compare those and talk to counsel on the other side you might be able to agree.

"And Mr. Lopatin has testified that he may have had lunch once or twice during this period of time with Judge Bronson.

"Is that something that can be stipulated to?

"*Mr. Miller*: Sure.

Exhibit O, Judge CLEMENTS' file, contains a memo from Judge Bronson, dated June 12, 1986, to Judge CLEMENTS regarding *Luszczynski*. The memo reads in part: "Dear Marty, Enclosed is what I consider to be a careful and effective draft of an opinion reversing. . . ."

### C. SPECIFIC FINDING THAT JUDGE BRONSON DID NOT SAY "SUBMIT [A SUPPLEMENTAL MEMORANDUM] TO ME . . . AND I'LL SEE THAT THE PROPER PARTIES GET A COPY OF IT."

We have carefully considered respondent's testimony on the question whether Judge Bronson made a statement from the bench to the effect that respondent could serve a memorandum on him alone and that he would get it to the proper parties. Having done so, we must reject this testimony and reiterate our finding that respondent engaged in an improper *ex parte* communication.

There are several factual elements to respondent's defense. First, we note what is not at issue. Respondent, in his closing argument and brief on remand, contends that there is no proof of an *ex parte* communication because the Administrator did not call opposing counsel as a witness in these proceedings. We reject this argument based on the testimony of respondent:

"*Q.* And what arrangements, if any, would be made to deliver it to opposing counsel?

"*A. There wasn't.* He indicated that, 'you get the memo to me and I'll see that the proper parties get a copy of same.'

"*Q.* And sir . . .

"*A.* (Interposing) *That meant to me that whoever was entitled to see the memo, he would see that they got it. And*

---

"*Mr. Cunningham:* I believe his testimony was different.

"[*Panel Chair*]: Well, they're willing to stipulate to it now.

"My notes indicate that there were contacts; once at a fundraiser for JESSICA COOPER that may have been during that period of time. That's something that with a little research you guys can stipulate to; two, that based on—and I'm assuming here—his calendar and Judge Bronson's calendar, you can agree on when or if they had lunch. . . . [Tr 560-561.]"

*I was following his instructions, what he said at oral argument.* [Tr 470; emphasis added.]"

Thus, the *ex parte* communication was established by more than circumstantial evidence. It was established by respondent's admission—the admission which forms an integral part of the testimony, and defense, that the *ex parte* communication was authorized in open court.

A critical element of respondent's defense or excuse is that respondent understood Judge Bronson's statement to be authorization to file a document with Judge Bronson only because Judge Bronson stated that he would, among other things, serve it on respondent's opponent. Another set of factual predicates crucial to the believability and coherence of respondent's story is that the Linkner memo was not surreptitiously submitted without her knowledge to Judge Bronson, but rather was openly submitted to Judge Bronson pursuant to his directive—and as a result of a conversation on the way back from oral argument in which respondent told Ms. Linkner to prepare the memo in accordance with Judge Bronson's instructions.

We find that Judge Bronson never said, "You get the memo to me and I'll see that the proper parties get a copy of same," for the following reasons:

1. RESPONDENT'S TESTIMONY WAS INCREDIBLE ON ITS FACE.

We recognize that judges and courts can have idiosyncracies. We can understand sending a post-oral argument brief directly to the panel.[10] We might even accept the remote possibility that a presiding judge might say, "get it to me and I'll get it to the panel" (and, depending on the circumstances, we might forgive the lawyer who thought this relieved her of filing the original with the clerk). However, we cannot understand why any judge would under these circumstances assume the responsibility of service on opposing parties. Nor can we understand how any lawyer in practice for more than a few months could believe he or she was relieved of this responsibility. We do not accept the

---

[10] Of course, the original would still have to be filed with the clerk.

notion that respondent would interpret a statement such as the one he claimed Bronson made as authorizing an *ex parte* submission.

### 2. RESPONDENT'S TESTIMONY WAS INCONSISTENT WITH MS. LINKNER'S MEMO AND HER TESTIMONY

In our general findings on this count we summarize respondent's testimony at pages 468-471 in six numbered paragraphs. We restate the first four here:

"(1) respondent discussed the type of memo requested by Bronson with Linkner on the way back from oral argument and 'he left it for her to prepare a memo pursuant to what Judge Bronson had requested' (Tr 468);

"(2) the Linkner memo is the memorandum she prepared pursuant to Bronson's request and her conversation with respondent (Tr 469);

"(3) respondent 'looked at the memo . . . [and] said it was fine' (Tr 469);

"(4) he 'left it up to her to get it delivered' or he 'could have arranged for the delivery of it to the Court of Appeals' (Tr 469)."

With the exception of paragraph 4, these statements cannot be squared with Linkner's testimony—even if one concedes that some loss of memory on her part would be normal.

Ms. Linkner testified that: (1) she did all of the appellate briefing an [sic] motion-writing in *Luszczynski*, and there were motions for costs and rehearing, as well as an appeal to the Supreme Court; (2) she would have probably done the supplemental brief if Bronson had ordered one; (3) she probably would have remembered if Bronson had ordered supplemental briefing; (4) if she had been asked to do a supplemental brief, it would not have been in the form of her memo to respondent (exhibits I & J); finally, (5) she confirmed her testimony in 1988—much closer to May 1986 than the time of this hearing—that she did not know why respondent wanted that memo.

Much of Ms. Linkner's testimony is strong circumstantial evidence that Judge Bronson didn't say anything about sup-

plemental briefs or memos. But, more important is her une-
quivocal testimony that if she had been told to submit a
memo for a judge or a court, it would *not* have been in the
form of exhibit I/J.

And this makes perfect sense. We cannot look at the
Linkner memo and give any credence to respondent's testi-
mony that it was prepared for filing with a court or judge,
and that he reviewed it and okayed it for filing. Again, it is
"To" Albert Lopatin, "From" Monica Linkner. It has the case
name, but not in caption form and there isn't a lower court
or Court of Appeals case number to be found anywhere. It
is clear from the content that, from Ms. Linkner's perspec-
tive, the memo was never intended for filing anywhere
except in a cabinet. The memo closed with, "If any ques-
tions, please advise. Monica." There is no last name, no
address, no phone number, no "P" number. It is not even
signed.

### 3. RESPONDENT'S TESTIMONY CLASHED WITH JUDGE GRIBBS'.

Judge GRIBBS did say that he didn't remember much about
oral argument in the case. But he also said that he thought
he would remember if Bronson said what is claimed. He
highlighted the usual procedures and that such a statement
would be a great departure. Most important are the follow-
ing unequivocal statements:

"(1) he has never heard any judge of the Court of
Appeals direct a litigant to file something without serving
the other side (Tr 1155); and,

"(2) he has never heard Judge Bronson instruct counsel
to send supplemental briefs directly to Judge Bronson, as
opposed to the usual method of filing (Tr 1165-1166)."

### 4. THE TESTIMONY OF RONALD DZIERBICKI IS CITED
### OUT OF CONTEXT BY RESPONDENT, AND, IN ANY EVENT,
### DOES NOT EXPLAIN OTHER CRITICAL EVIDENCE.

Mr. Dzierbicki testified, essentially, that if Judge Bronson
had said something like respondent claimed it would have
been so unusual that he would have heard about it. And, he
could not imagine counsel practicing that way. Mr.
Dzierbicki testified that Judge Bronson had occasionally
said "get it to me and I'll get it to the panel," but Dzierbicki

is unaware of Bronson ever excusing service on opposing counsel.

Even if Judge Bronson occasionally directed briefs to come to him, we do not believe that he agreed to serve counsel in this or any other case. Even more implausible is the claim that the Linkner memo was such a brief (see above).

### 5. RESPONDENT'S FILING PROCEDURES.

Respondent suggested that he was very hands-off regarding the filing of this document with Judge Bronson. He testified, "we have people who do that." His counsel elicited testimony from respondent's secretary, Karen Jamieson, that respondent gives no specific instructions. He just says "file this."

We have concluded that if things had proceeded in the ordinary course, the original would have been filed with the Court and copies would have gone to the other judges on the panel and to opposing counsel. In a firm of any size certain filing conventions or systems would be established. We feel it is safe to assume that a file clerk would be given standing instructions that the original is filed with the court.[11] Accordingly, respondent or Ms. Linkner would have had to intervene in the normal filing process and direct the clerk to deliver (or mail) one or more copies of the memo directly to Judge Bronson, and to no one else, which is what happened.[12] This is completely inconsistent with the theory argued by respondent's counsel (see, e.g., Tr 1527-1528).

CAVANAGH, J. (*concurring in part and dissenting in part*). Although I concur in the interim adoption of

---

[11]   Indeed, respondent's theory presumes that his secretary or clerk have standing instructions of some sort. Otherwise, he would not be able to just say "file this."

[12]   Linkner testified that she had no idea how the memo got to the Court of Appeals (Tr 1262), but that she is certain she did not arrange for service of the memo on Bronson, and that respondent did not instruct her to do so (Tr 1254).

the ABA standards, I disagree with the Court's decision that the ADB erred when it concluded that the law of the case doctrine barred it from increasing respondent's discipline beyond a forty-five-day suspension. Because the multiple proceedings below have already involved consideration of the specific ABA standards governing reprimand, suspension, and permanent disbarment, rather than remanding this case yet again, I would reinstate the hearing panel's forty-five-day suspension and terminate this eight and a half year ordeal.

Initially, the sequence of events in this case is key to the application of the law of the case doctrine. This case began when respondent was charged with several counts of misconduct, resulting in a reprimand from an AGC hearing panel. Both respondent and the Grievance Administrator appealed to the ADB, and the reprimand was affirmed. Next, both parties appealed to this Court, and we remanded to the hearing panel with specific instructions, retaining jurisdiction. On remand, the hearing panel believed that respondent's misconduct justified a harsher sanction, so it imposed a forty-five-day suspension. Both parties again appealed, challenging several of the panel's actions. This Court remanded to the ADB, directing it to consider respondent's arguments that the discipline was inappropriate, and denied both parties' appeals and cross appeals in all other respects. On second remand, the Grievance Administrator argued that respondent's sanction should be increased, but the ADB believed that it was barred by the law of the case doctrine from increasing the sanction beyond a forty-five-day suspension because this Court had denied the Grievance Administrator's appeal on that question. Thus, the ADB entered an order that it believed would finally resolve this case.

The majority concludes that the ADB erred, and that the ADB was not barred from increasing respondent's discipline. Because this Court denied leave on the question of increasing respondent's sanction, the majority asserts that the issue was not implicitly or explicitly decided, so the law of the case doctrine does not apply. Thus, it concludes that the ADB was free to order whatever sanction it believed appropriate. *Ante* at 259-261.

However, in a procedurally analogous case, this Court held that the law of the case doctrine does bar reconsideration of issues denied leave. In *Johnson v White*, 430 Mich 47; 420 NW2d 87 (1988), the plaintiff appealed a jury verdict of no cause of action, raising issues involving admitted testimony and jury instructions. The Court of Appeals held that the challenged testimony was properly admitted, but that the jury instructions were erroneous, so it vacated the verdict and remanded for a new trial. Both parties appealed, with the plaintiff challenging on the testimonial issue, and the defendant challenging on the instructional issue. This Court remanded *Johnson* to the Court of Appeals on the instructional issue in light of a new decision, but the plaintiff's cross appeal on the testimonial issue was denied "for failure to persuade that the questions presented should be reviewed by this Court." *Id.* at 52. On remand, the Court of Appeals upheld its prior decision on the instructional issue, but, additionally, it revisited the testimonial issue and reversed its earlier decision.

Defendant appealed to this Court once more, and this Court agreed to consider whether the jury instruction was error, but more importantly to the instant case, we agreed to consider whether the Court of Appeals erred by revisiting the testimonial issue. *Id.* We held that the Court of Appeals was barred by

the law of the case doctrine from revisiting the testi-
monial issue on remand. In our decision in *Johnson*,
we reasoned:

> Where a case is taken on appeal to a higher appellate
> court, the law of the case announced in the higher appellate
> court supersedes that set forth in the intermediate appellate
> court. Rulings of the intermediate appellate court, however,
> remain the law of the case insofar as they are not affected
> by the opinion of the higher court reviewing the lower
> court's determination. 5B CJS, § 1964, p 574.
>
> In the case at bar, this Court's order denying leave to
> appeal the plaintiff's cross appeal which concerned the [tes-
> timonial issue] left undisturbed the Court of Appeals adjudi-
> cations of those issues. Those adjudications are the law of
> the case and were not subject to further review by the
> Court of Appeals on remand from this Court. Accordingly,
> the Court of Appeals decision as to these issues must be
> vacated. [*Id.* at 53.]

Thus, when this Court denied leave on one issue but
remanded on another, the issue on which leave was
denied could not be revisited on remand. Further, if
the Court of Appeals had been allowed to reconsider
the issues for which this Court had already denied
leave, then the order denying leave would have been
rendered a nullity. *Id.* at 54.

Like the Court of Appeals in *Johnson*, the ADB was
barred in the instant case from reconsidering issues
for which this Court denied leave.[1] The majority
offers that this Court did not decide the issue of
increasing respondent's sanction because this Court
denied leave, but, as we stated in *Johnson*, rulings of
the intermediate court remain the law of the case

---

[1] The ADB provides intermediate review in attorney discipline cases. See
MCR 9.118.

when they are unaffected by the higher court's action. An opinion was not necessary to foreclose this issue, because "a court speaks through its orders and judgments and not through its opinions." *Id.* at 53. The majority is certainly correct that the denial of leave was not a decision on the merits, but the issue of increasing the sanction was decided by the ADB, and when this Court denied leave, that decision became final.[2] *Pipe Fitters Union Local No 392 v Kokosing Construction Co, Inc,* 81 Ohio St 3d 214, 218; 690 NE2d 515 (1998) ("where this court refuses jurisdiction following the issuance of an opinion by a court of appeals, the court of appeals' opinion becomes the law of the case"). As in *Johnson,* holding that the ADB was free to reconsider increasing discipline beyond the forty-five-day suspension would render a nullity this Court's order denying the Grievance Administrator leave on the same issue.

The majority also offers that this Court remanded for consideration of the level of discipline, so the ADB had discretion under MCR 9.118(D) to order the discipline it believed appropriate. *Ante* at 261. However, we remanded specifically for consideration of *respondent's* arguments concerning the appropriateness of the increased level of discipline. Respondent did not argue that he should receive increased discipline, so the ADB's discretion was limited by the remand order.

---

[2] Additionally, any argument that the decision did not become final because of the partial remand is undercut by *Johnson.* There, this Court did not revisit the merits of the issue for which leave was denied. We did offer a discussion of that issue, but only to refute the dissent's contention in that case that the Court of Appeals initial error was reason not to follow the law of the case doctrine. We held that our denial of leave on the issue foreclosed further review of that issue. The partial remand did not change that finality. *Johnson, supra* at 53-58; 5 CJS, Appeal and Error, § 849, p 354 ("the conclusiveness of the first judgment on appeal does not depend upon the character of the judgment as final or otherwise").

Thus, under this Court's decision in *Johnson v White*, the ADB was correct that it was barred by the law of the case doctrine from considering whether respondent's sanction could be increased beyond a forty-five-day suspension. When we denied leave on this issue, the ADB's decision became the law of the case, and if we now reconsidered it, our prior denial would be a nullity. Therefore, rather than prolong this case with yet another remand, I would reinstate the forty-five-day suspension and bring this lengthy ordeal to a conclusion.

Kelly, J., concurred with Cavanagh, J.