# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SEAN MICHAEL PHILLIPS,

Defendant-Appellant.

UNPUBLISHED
April 10, 2018

No. 336281
Mason Circuit Court
LC No. 15-002952-FC

Before: GADOLA, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of second-degree murder, MCL 750.317, for which he was sentenced to 19 to 45 years' imprisonment. Defendant was originally charged with open murder, but the trial court directed a verdict of not guilty of first-degree murder, MCL 750.316. We affirm.

## I. BACKGROUND FACTS

Defendant's conviction arises out of the high-profile disappearance of his four-month old daughter Katherine ("Kate") Phillips [the victim] who disappeared in Ludington, Michigan on June 29, 2011. Prior to her disappearance, Kate last was seen with defendant in his car. *People v Phillips*, unpublished per curiam opinion of the Court of Appeals, issued December 17, 2013 (Docket No. 311110) (*Phillips I*), p 1.

Defendant had a tumultuous relationship with the victim's mother, Ariel Courtland. When Courtland became pregnant with the victim, their second child, defendant disclaimed that he was the victim's father, accused Courtland of promiscuity, and urged Courtland to either get an abortion or give the victim up for adoption. Courtland refused, and by June 29, 2011, around four months after the victim was born, Courtland had begun legal proceedings to establish defendant as the legal father of the victim and to collect child support. On that day, defendant reported to the local hospital for a DNA test at around noon. From there, defendant went to Courtland's apartment complex, where he once again argued with Courtland about adoption— pleading with her to skip her DNA test and drop off the victim for adoption at the Department of Health and Human Services (DHHS) instead.

Under the guise of taking Courtland and the victim to the hospital for the DNA test, defendant drove the pair to DHHS instead. When Courtland refused to leave the victim with

-1-

DHHS, defendant drove them back to Courtland's apartment. At around 1:15 p.m., while Courtland was inside of her building to get a stroller for the victim, defendant drove off with the victim still in her car seat in the back of defendant's car. Courtland began frantically calling defendant and searching for his whereabouts. After about two hours, defendant returned to his home and did not have the victim with him.

Police officers who later confronted him found that while he did not have the victim, he had the victim's clothing in his pocket, balled up and inside out. The victim's car seat and diaper bag also were in defendant's trunk, and a dirty diaper was on the floor of defendant's car. Despite investigations and searches performed by the Ludington Police Department, Mason County Sheriff's Department, the Michigan State Police, and the Federal Bureau of Investigation (FBI), since that day, the victim has never been seen again.

## II. PROCEDURAL AND APPELLATE HISTORY

Given the absence of a body, defendant was originally charged with unlawful imprisonment, MCL 750.349b. After a jury trial, defendant was convicted and sentenced to 10 to 15 years' imprisonment. Defendant was given jail credit from the date of his arrest. Defendant appealed as of right, and this Court affirmed defendant's conviction and sentence. *Phillips I*, unpub op at 1.

While in prison serving that sentence, defendant sent a letter to Courtland describing the events that occurred after he left her apartment. Defendant explained how he ripped the car seat out of the back seat "as hard as [he] could," and the victim "was thrown from it." He wrote that he did not try to help the victim, but he believed there was nothing that could be done for her. Defendant purported that the victim was "set in a peaceful place," but that he did not "know where she was left." In addition to that letter, a fellow inmate of defendant's, Rushaun Burton, came forward with information that defendant stated he got rid of the victim and that he would never be charged with murder because the body never would be found.

Based on this new evidence, the prosecution charged defendant with open murder. The district court found that the prosecution had not established the *corpus delicti* of murder, refused to bind the defendant over for trial on the open murder charge, and dismissed the case. The circuit court reversed that decision, and this Court affirmed the circuit court on an interlocutory appeal. *People v Phillips*, unpublished per curiam opinion of the Court of Appeals, issued October 22, 2015 (Docket No. 326005) (*Phillips II*).

After remand, the case proceeded to trial where defendant was found guilty of second-degree murder and sentenced to 19 to 45 years' imprisonment. This appeal followed.

## III. DEFENDANT'S INTERVIEW

Defendant argues that the trial court committed error requiring reversal in playing a certain portion of his recorded interview with a police officer in violation of MRE 402 and MRE 403. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

Generally, "[w]hen the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). However, because the issues presented have not been preserved for review due to defendant's failure to object to the admission of the evidence at trial, this Court must review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* As such, "[r]eversal is only warranted if defendant was actually innocent and the plain error caused defendant to be convicted or 'if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings," ' regardless of defendant's innocence." *Roscoe*, 303 Mich App at 648, quoting *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004), quoting *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003).

Generally, "[a]ll relevant evidence is admissible[.]" MRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even where evidence is considered to be relevant, the evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403.

Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[r]elevant evidence is inherently prejudicial." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995) (internal quotations omitted). Rather, "[i]t is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *Id.* There is, therefore, a two-part test: "[T]his Court must make two distinct inquires under the balancing test of MRE 403. First, this Court must decide whether introduction of [the] evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (internal quotation marks omitted).

"Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Gipson*, 287 Mich App 261, 263; 787 NW2d 126 (2010), quoting *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008). The "major function [of MRE 403] is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Mills*, 450 Mich at 75 (internal quotations omitted). Such concerns arise where "the tendency of the proposed evidence [is] to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611 (internal quotation marks omitted). Additional concerns include "the danger of confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *People v Watkins*, 491 Mich 450, 489; 818 NW2d 296 (2012) (internal quotation marks omitted).

## B. ANALYSIS

Defendant challenges the admissibility of a series of statements made by his interviewing officer, Officer Tom Posma, at the end of the interview. During those statements, wherein Officer Posma summarized the evidence available at the time and explained to defendant his theory of events, defendant provided minimal answers, stating "yes" or "no" on rare occasions. In large part, the challenged statements summarized statements produced by defendant earlier in the unchallenged portions of the interview. Specifically, Officer Posma discussed that defendant had issues with Courtland in the past, and that he wanted to give the victim up for adoption. Defendant responded to some of those statements and questions, asserting that it was Courtland that was pushing the adoption more than him. Much of the remaining portions of the transcript related to Officer Posma reciting the evidence that had been collected that suggested that defendant was the last person to see the victim—Courtland saying he drove away with the victim in his car and that defendant was found with the victim's clothes in the pocket of his pants, the victim's car seat and diaper bag in the trunk of his car, and a used diaper in the back seat of the car. Defendant interjected answers during portions of the interview, but did not do so at others.

Defendant first argues that the statements by Officer Posma were not relevant pursuant to MRE 401, and thus inadmissible pursuant to MRE 402. The threshold for evidence to be determined relevant "is minimal." *People v Denson*, 500 Mich 385, 402; 902 NW2d 306 (2017) (internal quotation marks omitted). The Michigan Supreme Court has held that any tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is "sufficient probative force" to be determined relevant pursuant to MRE 401. *Denson*, 500 Mich at 401-402 (internal quotation marks omitted).

Considering that the prosecution charged defendant with open murder, one of the primary issues at trial was whether defendant intended to kill the victim. Given the inherent nature of intent, it can be established by minimal circumstantial evidence. This Court has held that certain evidence "tend[s] to establish defendant's consciousness of guilt." *People v Unger*, 278 Mich App 210, 225; 749 NW2d 272 (2008). Specifically, "[m]inimal circumstantial evidence is sufficient to show an intent to kill, and that evidence can include a motive to kill, along with flight and lying, which may reflect a consciousness of guilt." *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014), citing *Unger*, 278 Mich App at 225-227. Furthermore, evidence that a defendant had the opportunity to kill the victim "is logically relevant in a prosecution for murder." *Unger*, 278 Mich App at 224.

Officer Posma's statements summarizing the evidence establishing that defendant did not want the victim in his life was evidence related to motive, and was thus probative of defendant's intent. See *Henderson*, 306 Mich App at 11. Similarly, Officer Posma's statements regarding defendant's opportunity to kill the victim were relevant to the murder charge. See *Unger*, 278 Mich App at 224. Considering the brief nature of defendant's responses, Officer Posma's questions were needed to provide context for those answers. See *People v Musser*, 494 Mich 337, 355-356; 835 NW2d 319 (2013). Thus, Officer Posma's statements were relevant, probative, and admissible. See *id.*; MRE 401.

-4-

Defendant also argues that even if Officer Posma's statements were relevant, they still should have been excluded because their probative value was substantially outweighed by the danger of unfair prejudice pursuant to MRE 403. At its essence, the question is whether Officer Posma's statements and questions were unfairly prejudicial. "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *Gipson*, 287 Mich App at 263, quoting *Blackston*, 481 Mich at 460. Defendant, relying primarily on *Musser*, 494 Mich 337, asserts that Officer Posma's statements during the interview were unfairly prejudicial because they amounted to Officer Posma inappropriately vouching for his own credibility.

The Court in *Musser* considered a situation where the defendant was charged with second-degree criminal sexual conduct with respect to an 11-year-old girl. *Id*. at 339. The trial court admitted a video interrogation of the defendant, during which an officer specializing in "forensic interviews," repeatedly vouched for the credibility of the 11-year-old complainant. *Id*. at 343-346. The officer testified, before the video was shown, that his training in forensic interviews included certain "techniques" that required "the interviewer to inquire whether the child understands the difference between the truth and a lie." *Id*. at 346. The officer further stated that "older children, such as those around 11 years old, understand the difference between the two . . . ." *Id*. Our Supreme Court vacated the defendant's conviction, reasoning that "the undue weight that jurors may be inclined to place on police officers' statements heightened the prejudicial effect of the detectives' frequent out-of-court statements regarding the credibility of child complainants generally and the veracity of the complainant, thus offering the jury the much sought-after hook on which to hang its hat." *Id*. at 363 (internal quotation marks omitted).

This case is not factually similar to *Musser*. First, and most obviously, there was no testimony on the record from Officer Posma that he has some special training in determining when a witness is lying or telling the truth. Second, Officer Posma did not specifically vouch for any one person's credibility. To compare, the officer in *Musser* stated that the 11-year-old complainant's story was believable regarding the alleged assault, in a situation where the complainant made an uncorroborated accusation of sexual misconduct toward the defendant, and the defendant denied having done so. Thus, in *Musser*, the case necessarily hinged on whether the jury would believe the complainant or the defendant. *Id*. at 362-363. As such, the jury was able to "hang its hat" on statements from an officer, who was specially trained in forensic interviews and professed an ability to determine when a child was lying, that the child-complainant in the case was telling the truth. See *id*.

In light of the substantial amount of evidence presented at trial in this case, defendant's *Musser* analogy is not persuasive. See *id*. Officer Posma did not provide the jury "the much sought-after hook on which to hang its hat," because the prosecution's case did not hinge on Officer Posma's summary of events. See *id*. (internal quotation marks omitted). In sum, because Officer Posma's statements were relevant, probative of defendant's intent, and not unfairly prejudicial, the trial court did not err, plainly or otherwise, when it did not exclude them as evidence. MRE 401; MRE 403. Further, even if Officer Posma's statements were inadmissible or excludable, because they were merely cumulative to defendant's own later-made statements in his letter, defendant cannot prove that Officer Posma's statements changed the outcome of his trial. In any event, because this issue is unpreserved, there would be no grounds

for us to reverse absent such proof that defendant's substantial rights were affected and in this case they were not. See *Carines*, 460 Mich at 763.

## IV. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecution committed misconduct requiring reversal when it improperly evoked the jury's sympathy during closing arguments. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"Generally, a claim of prosecutorial misconduct is a constitutional issue that is reviewed de novo, but a trial court's factual findings are reviewed for clear error." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). However, given defendant's failure to object or request a curative instruction at trial, the issue presented has not been preserved for review, and this Court must review the "unpreserved claim for plain error affecting defendant's substantial rights." *Roscoe*, 303 Mich App at 648; *Brown*, 279 Mich App at 134.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). When considering allegations of prosecutorial misconduct, this Court must "examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. "[A] prosecutor is free to argue the evidence and all reasonable inferences arising from it as [it] relate[s] to . . . [the] theory of the case." *People v Johnson*, 315 Mich App 163, 201; 889 NW2d 513 (2015) (internal quotation marks omitted; alterations in original). "The prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66. However, "[a]ppeals to the jury to sympathize with the victim constitute improper argument." *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). An instruction by the trial court to the jurors that they should not consider the attorneys' arguments as evidence, should not allow their sympathy or compassion for the victim to sway their decision, and should only consider admissible evidence in determining a defendant's guilt typically is sufficient to cure any alleged prosecutorial error. See *Johnson*, 315 Mich App at 201.

## B. ANALYSIS

Defendant claims that portions of the prosecution's closing argument amounted to repeated and inappropriate attempts by the prosecution to evoke juror sympathy. However, a close review of the statements by the prosecution shows that, while argumentatively and persuasively worded, the closing was a summary of the facts and reasonable inferences made therefrom reflecting the prosecution's theory of the case. This Court repeatedly has held that such arguments are permitted. See *Johnson*, 315 Mich App at 201.

The facts introduced at trial establish that defendant drove away from Courtland's apartment with the victim in the back seat. His whereabouts for the two hours that followed are not known. However, the evidence at trial showed that he visited a woodsy, rough-terrain area, and had his telephone turned off during that time. When defendant finally returned to his home, he no longer had the victim. Further, he changed his shoes, from a pair of black Seedless brand

shoes to the pair in which he was arrested. Those black Seedless shoes were found in defendant's room, caked with mud, and plant material. Expert testimony revealed that the plant material found on those shoes likely came from a damp, swampy area. Additionally, defendant had the victim's clothes, turned inside-out and bundled up, in his pocket.

Much of the first portion of the closing argument that defendant challenges relates to the manner in which defendant disposed of the victim's body. The prosecution repeatedly referenced that the victim was naked, alone, and vulnerable in the woods. The evidence presented at trial clearly supports those inferences by the prosecution. Defendant had the victim's clothes and there was a dirty diaper in the back seat of his car, so a logical reference would be that the victim was naked. Further, eyewitness testimony allows for an inference that defendant spent approximately one hour in a heavily-wooded, swampy area, which supports that defendant left the victim's body there. That inference further was supported by defendant's shoes, which contained plant material that would come from such an area and the shoes were covered in dirt and mud. Lastly, a logical reference was plain that a four-month-old infant left alone in the woods would be vulnerable. Thus, the prosecution's statements that the victim was left alone, naked, and vulnerable in the woods, was not a call to the jury's sympathies, but instead was a summary of how the prosecution contended defendant likely committed the murder. Arguments made from the facts and the relevant inferences therefrom are permitted. *Id*. Further, the prosecution was not required to use the "blandest possible terms" in making that argument. See *Dobek*, 274 Mich App at 66. Thus, the prosecutor's closing statements did not amount to misconduct. See *id*.

The prosecution also referenced that the victim's existence was a problem for defendant, and that defendant's selfish goals outweighed his responsibilities to his daughter. Testimony introduced at trial showed that defendant did not believe that the victim was his child, urged Courtland to get an abortion or to put the victim up for adoption, and generally did not want to be involved in the victim's life. The prosecution's theory of the case was that defendant wanted the child out of his life, and when he realized that his plans for adoption or abortion were not going to come to fruition, he resorted to murder. Consequently, the prosecution asserted that an inference from the evidence provided was that defendant had motive to get rid of the victim, he intended to do so when he left her in the woods, and therefore he was guilty of murder. Thus, in arguing that defendant's selfish goals overwhelmed any sense of duty he had to the victim, the prosecution merely was summarizing the evidence and reasonable inferences therefrom regarding defendant's motive for the murder. As discussed, *supra*, motive was an important issue at the trial, because it was circumstantial evidence of defendant's intent. As noted, the prosecution is permitted to argue the facts and inferences therefrom in relationship to its theory of the case, and they need not do so in the "blandest possible terms." See *id*.; see also *Johnson*, 315 Mich App at 201. Consequently, the complained of statements did not amount to misconduct by the prosecution. *Id*.

The prosecution's references to defendant's "violence," and decision to dispose the victim like "trash," were also supported by the evidence. Defendant's letter revealed that he ripped the car seat out of his car and flung the victim on to the ground. An inference from that fact was that defendant acted violently. The prosecution's reference to defendant treating the victim like "trash," was an inference raised from the evidence that suggested defendant left the victim in the woods without clothes. That inference was further supported by Burton's

testimony that defendant got "rid of" the victim, and that he would never be charged with murder because no one would ever find the victim. Thus, the prosecution properly argued, in persuasive terms, that defendant committed an act of violence and disposed of the victim's body like it was "trash." See *id.*; see also *Dobek*, 274 Mich App at 66.

To the extent that some other statements appear to call for the sympathy of the jury, such as the prosecution's reference to the victim's need for a "warm hug" instead of "cold hands" that committed murder, or the victim's need to hear the words "I love you," instead of having the "cold winds" blow over her body, any such error was cured by the instructions the court provided to the jury. In those instructions, the trial court informed the jury that it should base its decision only on the admissible evidence—which did not include lawyers' arguments—and not its sympathy or prejudice. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Ericksen*, 288 Mich App 192, 199-200; 793 NW2d 120 (2010) (internal quotation marks omitted). Thus, those "instruction[s] cured any prosecutorial error that may have occurred during . . . closing arguments." *Johnson*, 315 Mich App at 201.

In sum, the prosecution did not commit any error, plain or otherwise, requiring reversal.

## V. *CORPUS DELICTI* & THE LAW OF THE CASE

Defendant argues that the circuit court erred in reversing the district court's decision to refuse to bind over defendant for trial on the open murder charge where the prosecution failed to prove the *corpus delicti* of murder without the use of defendant's confession. We previously decided this issue in *Phillips II*, unpub op at pp 6-9, and are thus bound by the law-of-the-case doctrine.

## A. LAW AND ANALYSIS

"Whether the law of the case doctrine applies is a question of law that we review de novo." *Duncan v Michigan*, 300 Mich App 176, 188; 832 NW2d 761 (2013). The Michigan Supreme Court has held that, pursuant to the law-of-the-case doctrine, "if an appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case . . . ." *Grievance Administrator v Lopatin*, 462 Mich 235, 259; 612 NW2d 120 (2000) (internal quotation marks omitted). The law-of-the-case doctrine "is a general rule that applies only if the facts remain substantially or materially the same." *People v Phillips (After Second Remand)*, 227 Mich App 28, 31-32; 575 NW2d 784 (1997). "Law of the case applies, however, only to issues actually decided, either implicitly or explicitly, in the prior appeal." *Grievance Administrator*, 462 Mich at 260. "Thus, as a general rule, an appellate court's determination of an issue in a case binds lower tribunals on remand and the appellate court in subsequent appeals." *Id.* The binding nature of the doctrine typically "applies without regard to the correctness of the prior determination." *People v Herrera (On Remand)*, 204 Mich App 333, 340; 514 NW2d 543 (1994) (internal quotation marks omitted). However, "[p]articularly in criminal cases, the law of the case doctrine is not inflexible and need not be applied if it will create an injustice." *Phillips*, 227 Mich App at 33. This Court has previously held that an "injustice" might be created where there was an intervening change in law, see *People v Spinks*, 206 Mich App 488, 496-497; 522 NW2d 875 (1994), or "where the prior opinion was clearly

erroneous," *Phillips*, 227 Mich App at 34, citing *People v Wells*, 103 Mich App 455, 463; 303 NW2d 226 (1981). See also *People v Olear*, 495 Mich 939; 843 NW2d 480 (2014) (reversing an opinion of this Court to determine "whether [there was] intervening case law providing an exception to the law of the case . . . .").

Our opinion in *Phillips II* clearly determined that defendant's letter was not a confession, and thus the issue defendant again raises were properly considered with regard to the *corpus delicti* rule and the establishment of the *corpus delicti* of murder. Therefore, the issue that defendant brings again on this appeal was "actually decided" in *Phillips II*. *Grievance Administrator*, 462 Mich at 260. An additional requirement of the law-of-the-case doctrine is that it "applies only if the facts remain substantially or materially the same." *Phillips*, 227 Mich App at 31-32. Since defendant's appeal in *Phillips II*, there has been no change in the material facts of the case. Indeed, defendant relies on the same facts from the preliminary examination to establish his argument in this appeal that he previously used in *Phillips II*. Thus, not only were the issues already decided in *Phillips II*, but there has not been any change in the material facts of the case. See *Grievance Administrator*, 462 Mich at 260. Consequently, the law-of-the-case doctrine applies unless there would be some "injustice." *Phillips*, 227 Mich App at 33. Considering that defendant does not identify and there does not appear to be any change in the applicable law with regard to confessions and the *corpus delicti* rule, and this Court's decision in *Phillips II* was well-reasoned, relied on binding law, and provided thorough analysis of the issues presented, defendant has not provided this Court with any reason to determine that an injustice would result if we refused to forego the law-of-the-case doctrine and consider the merits of this portion of his appeal. See *Olear*, 495 Mich 939; see also *Phillips*, 227 Mich App at 33.

In sum, we are bound by the law-of-the-case doctrine and refuse to consider this issue again in this appeal. See *id*. at 33-34.

## VI. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to establish that he was guilty of second-degree murder. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016), quoting *Ericksen*, 288 Mich App at 195. "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013), quoting *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015), quoting *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Tennyson*, 487 Mich at 735. "The prosecution

need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *Henderson*, 306 Mich App at 9. "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Henderson*, 306 Mich App at 9. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "In order to convict a defendant of second-degree murder, the prosecution must prove: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (internal quotation marks omitted).

## B. ANALYSIS

Before discussing the elements of second-degree murder, we first address defendant's assertion that his letter should not be considered under the *corpus delicti* rule regarding confessions. As discussed, *supra*, that argument has already been determined to lack merit in a prior appeal, and we are bound by that decision by the law-of-the-case doctrine. Thus, in considering whether there was sufficient evidence of defendant's second-degree murder conviction, we will consider defendant's letter.

Defendant asserts that there was insufficient evidence of every element of second-degree murder. First, therefore, defendant challenges the prosecution's proof that the victim died. This Court has held that "the victim's body is not necessary" to prove that a death occurred. *People v Fisher*, 193 Mich App 284, 287; 483 NW2d 452 (1992). Defendant's argument for this element relies primarily on his assertion that his letter was inadmissible pursuant to the *corpus delicti* rule regarding confessions. However, as noted, that letter was admissible, and provides sufficient proof of the victim's death. Particularly, in that letter, defendant stated that he threw the victim out of the back seat of his car. He then held her, but believed it was too late to do anything. Defendant stated that he took the victim to an unspecified area and left her in a "peaceful place." Further, defendant told Burton that the victim would never be found, that he got rid of her, and so would never be charged with murder. Although the victim's body was never discovered, the foregoing evidence provides sufficient circumstantial evidence of the victim's death. A reasonable juror could infer from defendant's statements that he got rid of the victim, he held her until it was too late, and he left her in a peaceful place, that the victim died. Even though Burton was equivocal at trial about whether defendant said he got rid of "the baby" or "the body," defendant's reference to never being tried for murder provides a logical inference that the victim died. This is especially true because the victim still has not been found nearly seven years after her disappearance. Considering that circumstantial evidence and the reasonable inferences therefrom, the jury was provided with sufficient evidence to find beyond a reasonable doubt that the victim is dead. *Blevins*, 314 Mich App at 357.

The second element of second-degree murder requires proof that the victim's death was caused by defendant. *Roper*, 286 Mich App at 84. Once again, defendant's letter and his statement to Burton were sufficient to establish this element. Defendant described that he threw the victim out of the car in a violent fashion. The letter did not describe when the victim actually

died, but in any possible case, the jury was permitted to infer that it was an act of defendant that caused the death. First, defendant could have caused the victim's death by throwing her from her car seat to the ground. A jury would have been permitted to make that inference based on defendant's statement in his letter that he did not try to help the victim, but that he did not believe there was anything that could have been done. Second, even if the victim survived that trauma, defendant also could have caused her death by leaving her alone in the woods without clothing. A reasonable juror could infer that a four-month-old infant left outside in the elements—likely in a wooded, swampy area based on where defendant was sighted and the state of his Seedless shoes—would not be able to survive for any significant period of time. Further, defendant's statement to Burton, that he got rid of the victim and they would never find her, provides an inference that it was defendant that caused the victim's death. Thus, if the victim died by being thrown from the car or by being abandoned in the woods, a reasonable juror could infer that the ultimate cause of that death was an act of defendant. Consequently, there was sufficient evidence provided that the victim's death was caused by defendant. See *Blevins*, 314 Mich App at 357.

Next, defendant challenges the third element of second-degree murder, which requires proof that defendant acted with malice. *Roper*, 286 Mich App at 84. "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). "The malice element for depraved heart murder is general mens rea." *Id*. "[I]ntent may be inferred from circumstantial evidence." *Henderson*, 306 Mich App at 11. "Indeed, 'because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind[.]' " *Id*., quoting *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

"Malice may be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v Werner*, 254 Mich App 528, 531; 659 NW2d 688 (2002). "Because depraved heart murder is a general intent crime, the accused need not actually intend the harmful result." *Goecke*, 457 Mich at 466. "One way of expressing this concept is that malice may be established even absent an actual intent to cause a particular result if there is wanton and wilful disregard of the likelihood that the natural tendency of a defendant's behavior is to cause death or great bodily harm." *Id*. Stated differently, "[t]he prosecution is not required to prove that the defendant actually intended to harm or kill. Instead, the prosecution must prove the intent to do an act that is in obvious disregard of life-endangering consequences." *Werner*, 254 Mich App at 531.

Certain evidence "tend[s] to establish defendant's consciousness of guilt." *Unger*, 278 Mich App at 225. Specifically, "[m]inimal circumstantial evidence is sufficient to show an intent to kill, and that evidence can include a motive to kill, along with flight and lying, which may reflect a consciousness of guilt." *Henderson*, 306 Mich App at 11, citing *Unger*, 278 Mich App at 225-227. Furthermore, evidence that a defendant had the opportunity to kill the victim "is logically relevant in a prosecution for murder." *Unger*, 278 Mich App at 224.

Viewing the facts in a light most favorable to the prosecution, defendant and Courtland had a long and tumultuous relationship. Defendant wanted Courtland to get an abortion or to

give the victim up for adoption. He would often pressure her to do so, and Courtland felt that she needed to lie about pursuing those options in order to avoid defendant's anger. Further, defendant refused to take responsibility for the victim, asserting that Courtland was promiscuous and someone else likely was the baby's father.

Several of the witnesses' testimony established that defendant was unhappy and surprised when Courtland pursued a paternity lawsuit against him. The officer that delivered the summons in the suit testified that defendant was angry, defendant's mother testified that defendant was shocked by the suit, and Courtland testified that he was angry with her. On the day of the victim's disappearance, defendant submitted to a DNA test to determine whether he was the victim's father. Courtland testified that she and defendant had an argument about that, and he asked her not to take the test and that the baby be placed for adoption instead. Courtland's refusal to do so and her expressed intent to go through with the DNA testing angered defendant. He refused to take Courtland to the hospital for the test and a neighbor heard them arguing in the parking lot. Additionally, an expert witness testified that defendant's computer showed searches related to "fake adoption papers" and how to terminate your parental rights. Defendant searched for ways to relinquish his rights to the victim so that he could avoid paying child support. From these facts, based on evidence introduced at trial, a juror could infer that defendant did not want the victim in his life, and he was facing a situation where his imminent involvement would be legally required. Thus, defendant had motive to kill the victim after finally realizing that Courtland would never pursue the adoption route and therefore, his expressed desire to have the victim absent from his life no longer was viable through the adoption or his previous wish that Courtland would abort the baby. This abundantly establishes motive, which is supported by circumstantial evidence of defendant's intent to kill the victim. See *Henderson*, 306 Mich App at 11.

The expert witness regarding computers testified that defendant also made searches relating to having his name changed and the law related to international waters. A reasonable juror could infer that, in searching those things, defendant was planning an attempt to run away, possibly after committing a crime. The possibility of "flight" is evidence of a guilty conscience, and could have been used by the jury to infer defendant's intent. *Unger*, 278 Mich App at 225-227.

Defendant also told several lies during his recorded interview with Officer Posma. First, defendant stated that he only had a brief relationship with Courtland. Based on the evidence submitted at trial and the testimony off all of the other witnesses, defendant's relationship with Courtland was long and complex. Second, defendant lied when he told Officer Posma that Courtland had the victim. Courtland's testimony along with the victim's clothes, diaper bag, and car seat being found in defendant's possession revealed that defendant was not being truthful. Lastly, defendant lied about only going to Wendy's between leaving Courtland's apartment complex and arriving home. There were two hours between those times that are unaccounted for by defendant. Testimony from eyewitnesses showed that defendant stopped at a fireworks stand and drove through an area of rough terrain in that same time period. Further, the amount of time it would take to drive from Courtland's apartment to Wendy's to defendant's home does not amount to two hours. Thus, in the moments immediately following the victim's disappearance, defendant told at least three lies to the police, two of which had the effect of making defendant look less culpable of the murder. As this Court has held that lying to the police is evidence of a

guilty conscience, these further allow for an inference of defendant's malice. *Henderson*, 306 Mich App at 11.

The testimony at trial also shows that defendant had the opportunity to kill the victim. Courtland's testimony was that defendant was the last person to be seen with the victim when he drove away from her apartment. Additionally, defendant's letter established that the victim was in the back seat of defendant's car during that drive. There were two hours unaccounted for immediately following defendant driving away from Courtland's apartment complex, during which defendant had his cellular telephone turned off and was seen driving into a wooded and swampy area. Plus, defendant previously told Dan Ruba that he could get rid of a body and no one would ever be able to find it. Thus, a reasonable juror could infer that defendant had the opportunity and means to kill the victim and dispose of the body, which also provides an inference of defendant's intent to kill. *Unger*, 278 Mich App at 224.

Considering all of this evidence, as well as the previously summarized content of defendant's letter and statement to Burton, the jury was provided with two different scenarios, both of which would establish the malice element of second-degree murder. There was the inference that defendant drove away with the victim in the back seat of his car with the intent to kill her. As discussed, defendant had motive, opportunity, and later showed a guilty conscience, all of which can imply an intent to kill. See *id*. Considering the sheer amount of that circumstantial evidence, the requirement to prove defendant's intent to kill was satisfied. *Kanaan*, 278 Mich App at 622. The jury also could have reasonably concluded that, although defendant did not intend to kill the victim when he drove away from Courtland's apartment complex, he "intentionally set in motion a force likely to cause death or great bodily harm." *Werner*, 254 Mich App at 531. In particular, by leaving the victim alone in the woods, without clothing or any support, there was sufficient evidence to prove that defendant had "the intent to do an act that is in obvious disregard of life-endangering consequences." *Id*. In either case, there was sufficient evidence for a reasonable juror to find beyond a reasonable doubt that the defendant acted with malice. *Henderson*, 306 Mich App at 11.

The last element of second-degree murder is that defendant acted "without justification or excuse." *Roper*, 286 Mich App at 84. Although defendant contends that the prosecution failed to prove every element of second-degree murder, he has provided no argument, before the trial court or on appeal, that he had some justification or excuse for killing the victim. To the extent that defendant suggests that the only evidence of the victim's death was that it was an accident, as reflected in defendant's letter, the jury was well supported in concluding otherwise. Burton's testimony that defendant said he got rid of the victim and could not be charged with murder allowed for a reasonable inference that the victim's death was not accidental. Further, defendant's behavior of turning his cellular telephone off, going to a woodsy area, changing his shoes when he got home to inhibit the collection of evidence, and lying to the police, all suggested that the victim's death was not accidental. Consequently, there was sufficient proof on the record that defendant had no excuse or justification in killing the victim. See *id*.

In sum, there was sufficient evidence of every element of second-degree murder for a jury to find defendant guilty beyond a reasonable doubt. See *Hardiman*, 466 Mich at 428.

VII.  INEFFECTIVE ASSISTANCE OF COUNSEL

-13-

Defendant argues that he was provided ineffective assistance of counsel requiring reversal of his conviction. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"Appellate review of an unpreserved argument of ineffective assistance of counsel, like this one, is limited to mistakes apparent on the record." *Johnson*, 315 Mich App at 174. "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Schrauben*, 314 Mich App 181, 189; 886 NW2d 173 (2016), quoting *Brown*, 279 Mich App at 140.

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *Schrauben*, 314 Mich App at 189-190, citing US Const, Am VI; Const 1963, art 1, § 20. "However, effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Schrauben*, 314 Mich App at 190. The United States Supreme Court has held that "in order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669. This Court will not find trial counsel to be ineffective where an objection would have been futile. *Thomas*, 260 Mich App at 457. "The defendant 'bears the burden of demonstrating both deficient performance and prejudice[;] the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim.' " *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015), quoting *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

## B. ANALYSIS

First, defendant claims that defense counsel was ineffective for failing to object to the trial court allowing the jury to hear Officer Posma's statements at the end of his interview with defendant. As discussed in Section III of this opinion, however, Officer Posma's challenged statements were not inadmissible or excludable. Therefore, any objection by defense counsel would have been futile. Thus, defense counsel was not ineffective for failing to object thereto. See *Thomas*, 260 Mich App at 457.

Second, defendant asserts that his counsel at trial rendered ineffective assistance of counsel by failing to object to the prosecution's allegedly improper closing argument. As discussed in Section IV of this opinion, the prosecution's statements during closing argument did not improperly call on the sympathies of the jurors, or, if they did only briefly, any issue was

cured by the trial court's jury instructions. With respect to the portions of the prosecution's closing arguments that were not improper, defense counsel was not ineffective for failing to object thereto because such an objection would have been futile. *Id.* Considering the small portions that may have sought sympathy from the jury, defense counsel's lack of objection was ultimately harmless, where the jury was properly instructed not to consider the prosecution's statements as evidence and to disregard any sympathy. Therefore, defendant is unable to prove that any possible errors by defense counsel "prejudiced his defense." *Jackson*, 313 Mich App at 431.

As such, defendant was not provided with ineffective assistance of counsel.

## VIII. JAIL CREDIT

Defendant argues that the trial court erred in refusing to award him credit for time served in jail dating back to the day of his arrest. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"The question whether defendant is entitled to sentence credit pursuant to MCL 769.11b for time served in jail before sentencing is an issue of law that [this Court] review[s] de novo." *People v Waclawski*, 286 Mich App 634, 688; 780 NW2d 321 (2009). "A criminal defendant's entitlement to credit for time served in jail is provided by MCL 769.11b[.]" *People v Raisbeck*, 312 Mich App 759, 766; 882 NW2d 161 (2015). The Michigan Supreme Court recently restated the proper procedure for statutory interpretation:

> In interpreting [a statute], our goal is to give effect to the Legislature's intent, focusing first on the statute's plain language. In doing so, we examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme. When a statute's language is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. [*Ronnisch Constr Group v Lofts on the Nine, LLC*, 499 Mich 544, 552; 886 NW2d 113 (2016) (internal citations omitted).]

Therefore, this Court must first consider the language of MCL 769.11b to determine whether defendant is entitled to his requested jail credit. See *id.*

The statute, in its entirety, provides:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing. [MCL 769.11b.]

"Before the enactment of the statute, a criminal defendant had no right to sentence credit for the period he was confined before sentence was imposed." *People v Prieskorn*, 424 Mich 327, 333; 381 NW2d 646 (1985). The Michigan Supreme Court, "on the basis of clear language of the statute," held that "[t]he Legislature sought, in enacting the statute, to give a criminal defendant a

right to credit for any presentence time served 'for the offense of which he is convicted,' and not upon any other conviction." *People v Adkins*, 433 Mich 732, 737; 449 NW2d 400 (1989), quoting *Prieskorn*, 424 Mich at 341. "MCL 769.11b neither requires nor permits sentencing credit except as provided in the statute." *People v Idziak*, 484 Mich 549, 569; 773 NW2d 616 (2009) (internal quotation mark omitted).

## B. ANALYSIS

Here, the defendant was arrested on June 29, 2011, which was the date of the victim's disappearance. He was initially charged, tried, and convicted of unlawful imprisonment. For that sentence, defendant was provided with 341 days' jail credit. *Phillips I*, unpub op at 1. While serving that sentence, defendant was later charged, tried, and convicted of second-degree murder. The trial court sentenced defendant to 19 to 45 years' imprisonment, and credited him with 1,163 days' jail credit, dating back to the day he was charged with second-degree murder.

Defendant asserts that he should have been provided jail credit dating back to the day of his arrest, June 29, 2011. The Michigan Supreme Court's decision in *Idziak*, although in a factually dissimilar case, is analogous to the present case. The defendant in that case was serving a prison sentence when he was paroled on May 10, 2006. *Idziak*, 484 Mich at 553 & n 1. While on parole, on November 23, 2006, the defendant committed an armed robbery. *Id*. at 553. He was arrested on November 28, 2006, pleaded guilty to armed robbery and possession of a firearm during the commission of a felony (felony-firearm), and was sentenced on March 6, 2007. *Id*. The trial court refused to award the defendant any jail credit for the new sentences. *Id*.

The defendant moved for postjudgment relief, asserting that he was entitled to jail credit from the time of his arrest to the day of his sentence for the new crimes. *Id*. The trial court denied the motion, and this Court denied the defendant's application for leave to appeal. *Id*. at 554. The Michigan Supreme Court, relying on its prior decisions in *Adkins* and *Prieskorn*, affirmed. *Idziak*, 484 Mich at 560-563. The Court provided the following reasoning:

> Consistent with our reasoning in *Adkins*, we hold that the jail credit statute does not apply to a parolee who is convicted and sentenced to a new term of imprisonment for a felony committed while on parole because, once arrested in connection with the new felony, the parolee continues to serve out any unexpired portion of his earlier sentence unless and until discharged by the Parole Board. For that reason, he remains incarcerated regardless of whether he would otherwise be eligible for bond before conviction on the new offense. He is incarcerated not "because of being denied or unable to furnish bond" for the new offense, but for an independent reason. Therefore, the jail credit statute, MCL 769.11b, does not apply. [*Idziak*, 484 Mich at 562-563.]

Because the defendant was incarcerated for the remaining time on his previous sentence due to his parole violation, and not "because of being denied or unable to furnish bond for" the new offense, the jail credit statute was simply not implicated. See *id*.

The present case can be similarly analyzed. First, defendant was sentenced to 10 to 15 years' imprisonment on June 5, 2012, for his false imprisonment conviction. He received jail

-16-

credit for that sentence, because he was "denied or unable to furnish bond" from the time he was arrested on the charge to the date of his sentence. MCL 769.11b. However, after that sentence, defendant was no longer "in jail" due to bond issues. Instead, like the defendant in *Idziak*, defendant in the present case was in prison for a reason independent of any issue related to bond. He was serving his sentence for his conviction for unlawful imprisonment. That fact remained consistent from the time he was sentenced for unlawful imprisonment until the time he was sentenced for his subsequent second-degree murder conviction. The jail credit statute, MCL 769.11b, is only implicated where a defendant is in jail, awaiting sentencing, due to being denied bond or being unable to pay bond. See *id*. At no point in the present case, which relates to his second-degree murder conviction, was defendant in jail or awaiting sentencing, due to his inability to pay bond or because bond was denied.

Defendant argues that the language used in MCL 769.11b, applying jail credit "for the offense of which he is convicted," refers to a general version of "offense." Specifically, defendant contends that the "offense" was the victim's disappearance—not the ultimate crimes for which he was convicted. Defendant argues that he was in jail for the baby's disappearance, or "offense," beginning in June 29, 2011, and deserves jail credit dating back to that day. However, our Supreme Court has specifically rejected this argument. See *Prieskorn*, 424 Mich 327; see also *Raisbeck*, 312 Mich App 759. According to the plain language of MCL 769.11b and the Court's analysis in *Idziak*, 484 Mich at 562-563, because defendant already was serving time for his earlier conviction, he was not entitled to jail credit dating back to the day of his original arrest relating to the baby's disappearance.

Affirmed.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan